UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

ESPIRE ADS LLC, THE BLU MARKET, INC., ex rel. LISA NAVARRO, THE BLU MARKET LLC, *ex rel.* LISA NAVARRO, and LISA NAVARRO individually,

   Plaintiffs,

 v.

TAPP MARKET INFLUENCERS, LLC, TAPP INFLUENCERS CORP., THE BLU MARKET, INC., THE BLU MARKET LLC, STEVEN FORKOSH, BRENNAN KASTNER, and JUSTIN EMERT,

   Defendants

---------------------------------------------------------------x

1:21-cv-10623-JGK

AFFIDAVIT IN SUPPORT OF MOTION

STATE OF NEW YORK

COUNTY OF NEW YORK

Steven Forkosh, being duly sworn, deposes and says:

1. I am the managing member of Tapp Market Influencers, LLC, president of Tapp Influencers Corp. ("Tapp"), president of The Blu Market Inc., managing member of The Blu Market LLC, and an individual defendant in this action. This affidavit is made in support of defendants' motion to dismiss each of the causes of action in the first amended complaint ("FAC") (Exhibit 1).

2. The overarching narrative of the complaint by plaintiffs Lisa Navarro ("Navarro") and Espire Ads. LLC ("Espire") involves alleged improper conduct by the defendants in connection with the competition between The Blu Market, Inc. ("Blu Market"), which I founded and Espire, founded by Navarro while employed at Blu Market.

3. While I understand that a motion to dismiss is limited to the pleadings and

1

related documents, additional information is provided herein to provide the court with context for what has transpired and a background of the business of social media influencing.

4. As documented herein, and detailed in affidavits of Justin Emert and Alex Vazquez, who have been previously associated with Navarro, the allegations of the Espire complaint as to the alleged acts by defendants actually describe the documented acts committed by Navarro against Blu Market as a faithless servant (one of the subjects of the complaint in the related action, TAPP Market influencers, LLC, et al v. Espire Ads LLC et al, Case No.1:21-cv-11068-JGK).

5. From the following, the court will see a carefully orchestrated, unfortunately successful, plan by Navarro to embed herself in Blu Market while operating her own competing company, Espire, stealing Blu Market's contacts, its marketing plans, its money, its employees and undoubtedly more, while remaining in its employ, then trying to steal an interest in Blu Market itself.

SOCIAL MEDIA INFLUENCING

6. I have been involved in the business of social media influencing for over 8 years.

7. I began in 2013 when I formed The Blu Market Inc., a New York corporation, and then formed The Blu Market LLC, a Delaware limited liability company in 2015.

8. Each company was engaged in social media influencer advertising and apps.

9. More recently, I formed TAPP Market Influencers LLC to engage in these

areas as well as other aspects of the advertising business.

10. Companies such as Blu Market and Espire are engaged by advertisers to increase public awareness and demand for various products.

11. We engage "affiliates" or "influencers", persons on social media with large followings, to promote the products by bringing them to the attention of their followers, people who follow the influencers on social media such as Instagram, Twitter, etc. These influencers are independent contractors, and always are engaged on a non-exclusive basis.

12. Companies such as Blu Market and Espire do not have their own platform for the promotions. The project is set up with providers such as Tune, a third party software on demand licensing company, which provides software infrastructure to track the projects for purposes of compensation to Blu Market or Espire and to the influencers. It tracks the project, records which influencer should be credited and provides periodic reports from which invoices can be generated.

13. Our employees often work remotely and in support of the motions of Justin Emert and Brennan Kastner to dismiss based on their lack of contact with New York, I can and do confirm that both Emert and Kastner worked remotely; they did not come to New York for my business more than three times over the past several years.

NAVARRO'S THEFT OF BUSINESS INFORMATION

14. Navarro began with Blu Market as an employee sometime in 2013 or 2014. Alex Vazquez was responsible for introducing her to me. At the time, Navarro had no prior experience and Vazquez and I introduced her to the business of affiliate and influencer marketing.

3

15. She gradually gained my trust and was appointed to the position Chief Operations Officer, which allowed her with unsupervised access to all of Blu Market's operations.

16. She had access to our business development plans to attract customers.

17. She had access to our marketing plans.

18. She interfaced with the clients we assisted and the influencers we employed.

19. She had sole responsibility to approve invoices and made payments to employees, influencers and vendors, all without oversight.

20. Although she continued with Blu Market until 2017, it turned out that she was a faithless employee for much of her employment as confirmed by the exhibits hereto and by Justin Emert and Alex Vasquez in their affidavits.

21. In May, 2015, Navarro secretly founded and began operating Espire, while working for Blu Market (Exhibit 2). She continued late into 2017, illegally stealing hundreds of thousands of dollars from Blu Market for her startup. See Exhibit 3.

22. As a trusted executive officer, Navarro acted without any oversight, allowing her free reign to brazenly strip Blu Market of customers, business opportunities, confidential personal information for its customers and influencers, employees and funds.

23. She subverted other Blu Market employees (defendant Emert, Eric Radtke, Nick Martino and Alex Vazquez) who joined in her plan and she then used these employees to steal files with customer information, influencer information and Tune files with operations information. In fact, by the time she was done, people were

asking if Espire and Blu Market were actually the same company.

24. Annexed as Exhibit 4 are emails forwarding lists of about 12,000 influencer contacts Navarro exported from Blu Market, a list compiled Blu Market prior to Espire's existence. Included on that list are the very influencers which she lists as having been "stolen" by defendants. These include Jeremy Rivera, Conner Wilson, Jason Samdeni, Michael Sisto, Max Nicols, Tanvir Rahmin, Miguel Maya, Blend Coleti (Kuliti on the attachment), Chris Murray, Nathan Ashfield and Faisal Shafiq and other documentation shows our relationship with Anilsa Arias (Anilise Arias in the complaint)

25. In April, 2017, Navarro had access to Blu Market's "pitch deck", the Blu Market business plan developed to attract clients.

26. Apparently, July, 2017 was when Navarro and her "team" decided to prepare for their departure.

27. Exhibit 5 is an example of Navarro and her cohorts advising Blu Market client of the coming "transition" in July, 2017, while Navarro was still embedded at Blu Market.

28. Annexed as Exhibit 6 is an I/O (insertion order) used by Blu Market and one used by Navarro for Espire. It reflects her diversion of business from Blu Market as late as August, 2017 and to add insult to injury, she even went so far as to pirate the exact same form used by Blu Market.

29. Annexed as Exhibit 7 are the copyrights Espire is suing on, supposedly created in July 2017 (as soon as she left), but not filed until November, 2021.

30. Blu Market had its own desktop and mobile apps. Exhibit 8 is just one example of Blu Market apps preceding Navarro's departure..

31. The copyright filing claims that Espire created its own desktop and mobile app software in 2017, while Navarro and her crew were pretending to be loyal employees.

32. It is not a stretch to conclude that having stolen everything else, Navarro stole the desktop and mobile apps as well.

33. Moreover, as indicated, Navarro had unfettered, unsupervised access to Blu Market funds. Around the same time as the copyright was filed, Navarro used her unsupervised access to authorize a Paypal disbursement to herself for $5,000, attaching her own note that this was for 1/3 of salary owed. Exhibit 9.

34. There was no "salary owed" and eventually we will determine where this money went, but the timing certainly suggests that not only did she steal the source code for the apps, the business plan and the influencer and client information, she stole the money to pay her attorneys to file the copyright or otherwise fund her company.

35. This is consistent with her conduct at Espire as well where, as set forth in the affidavit of Justin Emert, she treated the company as her personal bank account.

36. As late as September, 2017, Navarro was not only still using her Blu Market email, but used it to create a Linked In account for Espire. Exhibit 10 .

37. For whatever reason, Navarro clearly harbored some deep seated malice against me.

38. After stealing whatever she could from Blu Market, one Monday in 2017, Navarro left without notice, taking defendant Justin Emert, as well Erik Radtke, Jon Melendez and Nick Dimartino, who were Blu Market employees. I came in that Monday to an empty office with no clue as to what had taken place.

39. In addition, Navarro and Melendez (her boyfriend) went into Blu Market offices and stole records physically located on premises. As further evidence of that malice, Navarro went so far as to steal American Express gift cards used in the business, and left a note behind in the envelope which held the cards, "looking for something?".

40. After Navarro left, she and her boyfriend threatened me. They communicated that if I ever took any action against Navarro for her faithless actions or challenged Espire's use of Blu Market's information, they would engage in physical violence against my family and Navarro and Melendez would publicly defame me over social media using what she claimed were embarrassing photographs and videos of me which she had secretly taken just for this purpose. See also the affidavits of Emert and Vazquez herewith.

41. I understand that this was standard practice for Navarro, and that she made the same threats to an Espire Board member who was challenging her misuse of Espire funds.

## ESPIRE'S LACK OF CAPACITY

42. Although the allegations of the FAC are deficient in many respects, if should first be noted that Espire lacks the capacity to sue. Espire operated in New York. Annexed as Exhibit 11 is a printout of its past New York Workers Compensation insurance coverage and a New York judgment against it for unpaid workers compensation insurance contributions.

43. Moreover, the insertion order, Exhibit 6 and reincluded with Exhibit 11, reflects Espire's New York address.

44. However, Espire never registered as a foreign business entity (Exhibit 12) and I am advised that the failure to register precludes Espire from suing in New York.

THE "JOINT VENTURE" CLAIMS (Counts V through XII, XXXI through XXXVIII)

NAVARRO'S FIRST ATTEMPT TO EXTORT AN
OWNERSHIP INTEREST IN MY BUSINESS

45. Simply stealing Blu Market funds and information and threatening me, however, was not enough.Navarro has had a long-term history of trying to steal my actual company as well.

46. In July/August, 2017, Navarro made the incredible assertion that she was actually a shareholder of The Blu Market Inc.

47. In response, counsel for Blu Market rejected her claims and summarized the exposure Navarro faced should she persist. Exhibit 13.

48. Navarro's attempted extortion quicky ended. Nothing further came of her threats and we moved on.

THE "JOINT VENTURE"

49. Despite the foregoing, in July, 2020, Navarro and I actually engaged in discussions about doing business together.

50. We went as far as drafting a proposed agreement but could never come to terms.

51. During negotiations, however, Navarro presented an abbreviated interim agreement in order to move forward. The agreement is annexed as Exhibit 14.

52. The agreement asserted that Navarro was the sole owner of Espire.

53. That representation was untrue. Annexed as Exhibit 15 is what we believe

to be the most recent Espire operating agreement in effect at that time. It shows several equity owners.

54. We know for a fact that at least two equity owners remain, John Radtke and defendant Justin Emert, negating the claim that she is the sole owner. See Emert affidavit.

55. Significantly, Navarro has continued her morally bankrupt practices at Espire. Annexed as Exhibit 16 is a list circulated by John Radke of the fiscal and corporate improprieties committed by her.

56. The "joint venture" agreement was not the final agreement just a step in that direction. It provided that the parties "shall" enter into a "50%/50% partnership" for the company. When completed, I would retain 50% of all three entities as would Navarro.

57. It also provided for the creation of an operating agreement for the anticipated venture.

58. We never did any of the foregoing and agreement was never effectuated.

59. Contrary to plaintiffs' claims, the "joint venture" agreement never progressed at all, much less to a point where either of us had access to information of the other.

60. No joint venture was created.

61. No transfer of interests occurred.

62. No operating agreement was drafted for the proposed joint venture.

63. Although it provided for the payment of salaries, needless to say no payments were made.

64. No entity was created and no tax return was filed.

65. Moreover, based upon the Espire operating agreement, and as set forth in the memorandum of law submitted herewith, Navarro was not even authorized to commit to the transfer of her interest.

66. In fact, it would appear that if Navarro had transferred 50% of Espire, she would have been left with 1% based upon the equity schedule set forth in the last operating agreement.

67. As nothing moved forward, and after learning that Navarro did not even have the authority to enter into an agreement and her representations were fraudulent, my attorney contacted Navarro's attorney to rescind the agreement such as it was (Exhibit 17).

68. Navarro and I spoke and agreed to rescind any agreement to the extent there was an agreement to rescind. My attorney forwarded a draft to her counsel, copying Navarro as well (Exhibit 18).

69. Her counsel, again copying Navarro, indicated that the "joint venture" agreement had never been signed in the first place (Exhibit 19). He amended the draft rescission agreement to reflect that but after the revision, we never heard further. However, as long as Navarro's position was that the agreement had never been signed and she agreed to rescind in any event, we never pursued it.

NAVARRO'S SECOND ATTEMPT TO STEAL AN INTEREST IN MY BUSINESS

70. Despite the admission that we had no agreement and the agreement rescinding whatever there might have been, Navarro now asserts that the agreement was executed and it remains effective.

71. Despite the complete lack of effort on either side to effectuate it, despite Navarro's misrepresentation of ownership and lack of authority to execute the agreement, she claims that the agreement is not only enforceable but has created rights for Navarro to my companies' income, assets and operations, and restrictions on me which would preclude my continued efforts in this field.

72. As set forth in the memorandum of law, Navarro's admission that no agreement was signed and her agreement to rescind should preclude her claims.

73. However, even if the agreement were executed, it was never implemented, it could not have been implemented and it was rescinded before anything else occurred.

74. It also bears noting that if in fact the agreement were effectuated, Navarro's continued efforts through Espire would be a violation of the restrictive covenant she seeks to enforce against me. Her own actions continuing with Espire is further evidence that whatever agreement there might have been, it was never implemented.

75. The agreement also provided for the right to terminate on 60 days notice.

76. The notice to rescind was, at a minimum, a termination of the venture. At that point, the agreement provides that the company, which had no business or assets, had to be liquidated, after which we would each be subject to restrictive covenants precluding each of us from continuing in this field. Needless to say, that result was both unintended and ridiculous.

77. If in fact Navarro has transferred 50% of Espire to this joint venture then her interest in Espire is de minimis and she lacks the authority to commence this action

on Espire's behalf in the first place.

## THE FAILURE TO NAME A NECESSARY PARTY

78. While Navarro pledged 50% of Espire to the joint venture, she had previously taken steps to divert its income and assets to another company, doing to her Espire partners what she did to me at Blu Market.

79. Kvrma, LLC is a California limited liability company formed by Navarro in 2019. Its authority has deem suspended for failure to pay taxes (Exhibit 20).

80. Kvrma Foundation (Kvrma Corp.") is a California foundation formed by Navarro in 2019 (Exhibit 21).

81. Each is owned and operated by Navarro in whole or in part.

82. Kvrma Corp. holds itself out as a 501(c)(3) entity although it is not (Exhibit 22).

83. Apparently, although a "foundation", Kvrma Corp. is also engaged in social media influencing as well as other business such as the sale of clothing (Exhibit 23).

84. The complaint has been framed as an action by Espire and Navarro for various issues relating to Espire's intellectual property.

85. However, Navarro has recently stated on an Instagram broadcast that Blu Market's intellectual property had been purchased from it by Kvrma (not Espire) for $50,000. As it is unclear which Kvrma Navarro refers to in the broadcast, the references herein are to Kvrma without specifying which one.

86. Navarro further stated that all business is being moved to Kvrma.

87. Finally she stated that she is out of the business because everyone was competing for influencers and a third party told advertisers not to work with her.

88. A transcript is of the broadcast is excerpted at Exhibit 24.The video, which is a large file, is available for the court's review.

89. If Kvrma owns the intellectual property in issue and the Espire business has been moved, then it is the real party in interest and a necessary party to this action for the alleged damages from the wrongful use of that property.

90. If the Espire influencing business is now conducted by Kvrma then it is the real party in interest and a necessary party to this action.

91. Moreover, if Espire claims a loss of business and that business was in fact diverted to Kvrma (just as she secretly stole business from Blu Market when she formed Espire), then Kvrma should be a party as any loss would be attributable to Navarro's diversion, not the alleged acts of defendants.

92. In terms of infringement and the loss of business, it is also significant that in the broadcast, Navarro states that she is out of the "app install lane" and exclusively engaged in survey marketing.

93. She also states that the reason is that Plug Co. told advertisers not to work with Navarro. Plug Co. is a giant in the social media influencing business, one of many.

94. The fact that Plug was able to tell advertisers not to work with Navarro underscores the fact that advertisers and influencers are not proprietary or confidential.

95. This also dramatically contradicts all of the claims for lost business infringement of mobile and web application source code when Navarro admits that they are no longer in that business at all.

## TRADE SECRETS (COUNTS I and II)

96. Apart from denying that defendants accessed or used any "trade secrets"

or restating the obvious, that any methods Espire may employ had their origin at Blu Market, the problem with the complaint is that it fails to identify exactly what trade secrets have been stolen, beyond the generic boilerplate allegations, and as such the claims cannot be addressed.

TORTIOUS INTERFERENCE/INJURIOUS FALSEHOOD (COUNTS III AND IV)

97. The same pleading defects hold true for the tortious interference/injurious falsehood claims. While I deny that anything improper occurred, there is no way to address these vague claims further.

98. At a minimum, some degree of specificity should be required.

99. No clients who left are listed.

100. There is nothing to indicate what might have been stated and by whom.

101. In fact, that is an issue for much of the complaint, where the only allegations asserted are vague and there is no attribution as to which defendant was responsible for the conduct alleged.

102. While we deny any malicious conduct, the "targeting" of any influencers and certainly deny marketing any "shield", Espire does not identify any influencer who would not do business with it. The list of influencers it provides are not ones who allegedly left as a result of the purported conduct, but ones who Espire claims were solicited. There is no list of influencers who left as a result of this alleged solicitation and nothing to suggest that Espire had any contract with them, exclusive or otherwise.

103. Unlike plaintiffs, defendants claim no exclusive right to influencers. However, to the extent that plaintiffs argue the defendants stole the influencers from Espire, the list that Navarro stole (Exhibit 4) shows that it had been defendants with the

pre-existing relationships.

104. With respect to the confidentiality of customers and influencers, the argument is absurd.

105. Influencers and customers are available for the world to see. That is the whole point of social media influencing and once again, Espire offers nothing beyond boilerplate to assert that these identities were somehow confidential and/or exclusive to Espire alone.

106. Moreover, as set forth above, one of her acts as a faithless employee was to export a list of contact information for over 12,000 influencers with whom we had relationships. It is highly unlikely that Navarro developed any relationships with influencers who we were not already aware of or doing business with.

107. Finally, with respect to any restrictive covenant which might apply to Emert or Kastner, I was unaware of any and remain unaware. Neither has an executed agreement and Espire has not seen fit to annex any restrictive covenant agreement with them.

## THE FLUENT PURCHASE OFFER

108. The claim that there had been an offer by Fluent to purchase 30% of Espire for $3,500,000 is a fascinating piece of wishful thinking.

109. First, there is nothing offered to support this allegation beyond a conclusory statement. How was this accomplished and by whom?

110. Second, our understanding is that there had never been such an offer.

111. Third, if Navarro claims I own 50% of Espire, how did this offer come about without notice to me and exactly where is this 30% to come from.

112. Finally, while we do not doubt that Espire is in desperate financial circumstances, that distress existed long before any events described in the complaint and is not due to anything alleged in the complaint.

113. Navarro has looted Espire as shown on the complaint list by equity holder Radtke (Exhibit 16).

114. Navarro effectively and illicitly cashed out her equity and funded her trips abroad.

115. Espire was registered as a foreign entity to do business in California where it claims to be based but that authority was suspended by the California Tax Board for failure to file returns (Exhibit 25).

116. Espire has engaged in business in New York. In fact, Navarro used Espire funds to pay for her New York apartment. See Exhibit 6. However, Espire failed to register as a foreign business in New York and as it has not paid California taxes, it is reasonable to assume that it failed to pay New York taxes as well.

## RESTRAINT OF TRADE (COUNTS XXVII AND XXVIII)

117. Moving on briefly to the allegations of a violation of Federal and New York antitrust laws, the claim is incomprehensible other than as evidence of an intent to harass by including any and every possible claim under the sun whether relevant or not.

118. There are hundred of companies engaged in social media advertising. Examples include Stacks (stacks.app.lcc), the plug.co (jet fuel), the yoke (yoke network ltd), Adsessions, Facebook Ad Manager, Tiktok Ad Manager and many more.

119. There also thousands of social media influencers(see Exhibit 4).

120. Although we have done nothing wrong, if we had, it would certainly not

rise to the level of antitrust violations.

### RICO/CFAA VIOLATIONS (COUNTS XX-XXIV, XXIX)

121. The same vague allegations make the claim impossible to address the alleged RICO claim. However, I am advised that as set forth in the memorandum of law submitted herewith, the allegations which are asserted do not to rise to the level of actionable conduct.

### COPYRIGHTS (COUNTS XXV and XXVI)

122. The two copyrights which Navarro claims have been infringed are 2018 copyrights filed by Espire for a desktop and mobile app. Exhibit 7.

123. As set forth above, we believe that Navarro stole this from Blu Market as well.

124. So if there are similarities, and that has yet to be determined, it is not because Blu Market copied Espire's, it is exactly the opposite.

### PIERCING THE CORPORATE VEIL

125. The attempt to hold me personally liable by piercing the corporate veil should be rejected as well.

126. Although I am advised that it is not an actual cause of action, the general allegations in the complaint are inadequate in any event as set forth in the memorandum of law.

127. I would also point out to the court that TAPP Influencers Corp. is a New York corporation with four shareholders and TAPP Market Influencers, LLC is an LLC which has 5 members.

128. Neither could be my alter ego under the circumstances.

129. I refer the court to the memorandum of law which addresses the foregoing
...

causes of action in addition to the other causes of action in the complaint.

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　STEVEN FORKOSH

Sworn to me the 26 day
of April, 2022

_Leah Riman_

LEAH RIMAN
Notary Public-State of New York
No. 01RI6061956
Qualified in Kings County
Commission Expires July 23, 2025