EXHIBIT 15

# Espire Ads LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

THE MEMBERSHIP UNITS REPRESENTED BY THIS AMENDED AND RESTATED OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**ARTICLE I  DEFINITIONS** ...................................................................................................3

**ARTICLE II  ORGANIZATIONAL MATTERS**.................................................................9

Section 2.1    Name of the Company.............................................................................9
Section 2.2    Purpose ...................................................................................................9
Section 2.3    Term .......................................................................................................9
Section 2.4    Registered Office and Agent...................................................................9

**ARTICLE III  CAPITAL AND CONTRIBUTIONS** ..........................................................9

Section 3.1    Units .......................................................................................................9
Section 3.2    Initial Capital Contributions....................................................................9
Section 3.3    Additional Capital Contributions.............................................................9
Section 3.4    Capital Accounts; Return of Capital ......................................................10
Section 3.5    Loans .....................................................................................................10
Section 3.6    Options ...................................................................................................10

**ARTICLE IV  DISTRIBUTIONS AND REDEMPTIONS**....................................................10

Section 4.1    Distributions Generally ..........................................................................10
Section 4.2    Distributions ..........................................................................................10
Section 4.3    Distributions with Respect to Tax ..........................................................10
Section 4.4    In-Kind Distributions.............................................................................11

**ARTICLE V  ALLOCATIONS OF PROFITS AND LOSSES** ...........................................11

Section 5.1    Allocation of Profits and Losses ............................................................11
Section 5.2    Special Allocations to Capital Accounts and Certain Other Income Tax Allocations ...........................................................................................12
Section 5.3    Reallocation by the Operating Board .....................................................14
Section 5.4    Tax Allocations ......................................................................................14

**ARTICLE VI  MANAGEMENT POWER, RIGHTS AND DUTIES** ....................................14

Section 6.1    Management.............................................................................................14
Section 6.2    Meetings of and Voting by Members.......................................................17
Section 6.3    Personal Services; Compensation ..........................................................17
Section 6.4    Other Business Interests ........................................................................17
Section 6.5    Liability and Indemnification..................................................................18
Section 6.6    Power of Attorney....................................................................................18

**ARTICLE VII  TRANSFERS OF UNITS; ADMISSION OF MEMBERS** ...........................19

Section 7.1    Restrictions on Transfer .........................................................................19
Section 7.2    Acceptance of Transfer ..........................................................................20
Section 7.3    Admission of Members or Transfers of Economic Interests .................20
Section 7.4    Withdrawal of Members..........................................................................20
Section 7.5    Sale of the Company................................................................................20

Section 7.6    Repurchase Upon Withdrawal. ...............................................................21
Section 7.7    Priority Rights of Company and Other Members ...............................22
Section 7.8    Additional Restriction ...........................................................................23

**ARTICLE VIII  DISSOLUTION OF THE COMPANY ...............................................23**

Section 8.1    Events of Dissolution ............................................................................23
Section 8.2    Procedure for Winding Up and Dissolution ........................................23
Section 8.3    Filing of Articles of Dissolution...........................................................24

**ARTICLE IX  BOOKS AND RECORDS ...................................................................24**

Section 9.1    Deposits .................................................................................................24
Section 9.2    Books and Records ................................................................................24
Section 9.3    Annual Accounting Period ....................................................................24
Section 9.4    Reports ...................................................................................................24
Section 9.5    Tax Matters Partner ..............................................................................25
Section 9.6    Tax Elections.........................................................................................25

**ARTICLE X  COVENANTS TO PROTECT GOODWILL ...................................25**

Section 10.1   Non-Competition...................................................................................25
Section 10.2   Non-Solicitation ....................................................................................25
Section 10.3   Additional Acknowledgments and Agreements....................................25
Section 10.4   Confidentiality.......................................................................................26

**ARTICLE XI  MISCELLANEOUS...........................................................................26**

Section 11.1   Notices, Consents, etc ..........................................................................26
Section 11.2   Public Announcements..........................................................................26
Section 11.3   Severability............................................................................................26
Section 11.4   Amendment and Waiver........................................................................27
Section 11.5   Documents .............................................................................................27
Section 11.6   Counterparts..........................................................................................27
Section 11.7   Expenses................................................................................................27
Section 11.8   Governing Law......................................................................................27
Section 11.9   Headings................................................................................................27
Section 11.10  Assignment............................................................................................27
Section 11.11  Entire Agreement ..................................................................................27
Section 11.12  Third Parties ..........................................................................................28
Section 11.13  Interpretative Matters ...........................................................................28
Section 11.14  Construction ..........................................................................................28
Section 11.15  No Partnership Intended for Non-Tax Purposes ...................................28

SCHEDULE A.......................................................................................................................S-1

# AMENDED AND RESTATED OPERATING AGREEMENT OF
## Espire Ads LLC
### a Delaware limited liability company

This **AMENDED AND RESTATED OPERATING AGREEMENT** (this "**Agreement**") is entered into as of July 26, 2017 by Espire Ads LLC, a Delaware limited liability company (the "**Company**"), and those persons who execute this Agreement on the date hereof and from time to time thereafter.

## W I T N E S S E T H: T H A T

**WHEREAS**, the Company was formed on May 8, 2015, by the filing of its Articles of Organization with the Department of State.

**WHEREAS**, the Company and its then sole member entered into an Operating Agreement of the Company effective as of May 8, 2015 (the "**Original Operating Agreement**").

**WHEREAS**, the Company and the Members desire to amend and restate the Original Operating Agreement in its entirety as set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing promises and the mutual covenants of the Members hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

"**Act**" means the Delaware Limited Liability Company Act, as amended from time to time.

"**Additional Units**" means (i) any Units in the Company, whether now authorized or not, (ii) any rights, options or warrants to purchase any such Units, or to purchase securities that may become convertible into, exercisable for or exchangeable for such Units, and (iii) any securities convertible into, exercisable for or exchangeable for Units, and (iv) notes or debt securities containing equity or profit participation features; provided, however, Additional Units shall not include (a) securities issued as a dividend on, subdivision of or other distribution in respect of all Units, (b) securities issued upon conversion, exercise or exchange of any previously issued Additional Units or (c) securities issued pursuant to the acquisition of another Person by the Company by merger, purchase of substantially all of the assets of such other entity, or by other reorganization whereby the Company ends up owning, directly or indirectly, greater than fifty percent (50%) of the voting power of such entity or otherwise controls such entity.

"**Affiliate**" with respect to any Member means: (i) any Person controlling, controlled by or under common control with said Member (including any partnership in which such Member serves as a general partner or any corporation in which such Member owns greater than 10% of the issued and outstanding voting capital stock); and (ii) any key officer, director, trustee or

general partner of any Person so controlling, controlled by or under common control with said Member.

"**Agreement**" means this Agreement, as amended, modified or supplemented from time to time.

"**Approved Sale**" is defined in Section 7.5(a) of this Agreement.

"**Business Days**" means any day on which business is ordinarily conducted in the State of Delaware, which excludes all United States national, Delaware and bank holidays.  If any notice or other communications is required to be delivered, pursuant to the terms of this Agreement, on a day which is not a Business Day, such notice shall not be required to be delivered until the next Business Day after the original required delivery date.

"**Capital Account**" means, with respect to each Unit Holder, the account maintained for the Unit Holder on the books of the Company which will initially equal the cash contributed by such Unit Holder to the Company, and throughout the term of the Company will be (i) increased by the amount of (a) income and gains allocated to such Unit Holder pursuant to Article V, and (b) any cash or fair market value of property (as determined by the Majority Holders) subsequently contributed by such Unit Holder to the Company, and (ii) decreased by the amount of (a) losses and deductions allocated to such Unit Holder pursuant to Article V, and (b) the amount of distributions in cash and the fair market value (as determined by the Majority Holders) of distributions of property (net of liabilities secured by the property that the Unit Holder is considered to assume or take subject to) distributed to such Unit Holder. The foregoing provisions and all other provisions of this Agreement pertaining to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent therewith.

"**Capital Contributions**" means the aggregate amount of cash and Gross Asset Value of property (less the amount of indebtedness, if any, of such Unit Holder which is assumed by the Company and/or the amount of indebtedness, if any, to which such property is subject, as of the date of contribution, without regard to the provisions of Code Section 7701(g)) contributed by a Unit Holder to the capital of the Company.

"**Cash Flow**" means, for any period, the amount by which (i) the gross cash receipts of the Company from any source for such period (including, but not limited to, Capital Contributions, loans, distributions received by the Company in respect of any stock, partnership interest or other equity interest owned by the Company, and proceeds from the sale, financing, refinancing or other disposition of all or any portion of the Company property), exceed (ii) the sum of (a) the aggregate cash disbursements for such period (including, but not limited to, Company administrative costs, principal and interest payable on Company debt and capital expenditures), and (b) amounts previously set aside as reserves as determined by the Operating Board in its discretion.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" means the limited liability company formed pursuant to the Original Operating Agreement and operating in accordance with this Agreement.

"**Company Minimum Gain**" means the gain (regardless of character) which would be realized by the Company if the property subject to a nonrecourse debt (other than a "partner nonrecourse debt" as such term is defined in Section 1.704-2(b)(4) of the Regulations) were disposed of in full satisfaction of such debt on the relevant date. Such amount shall be computed separately for each nonrecourse liability of the Company. For this purpose the adjusted basis of property subject to two or more liabilities of equal priority shall be allocated among such liabilities in proportion to the outstanding balances of such liabilities and the adjusted basis of property subject to two or more liabilities of equal priority shall be allocated among such liabilities in proportion to the outstanding balances of such liabilities and the adjusted basis of property subject to two or more liabilities of unequal priority shall be allocated to the liability of inferior priority only to the extent of the excess, if any, of the adjusted basis of such property over the aggregate outstanding balance of the liabilities of superior priority. If property is reflected in the Capital Accounts of the Company at other than its basis, Company Minimum Gain shall be determined by using the amount recorded for such property in determining Capital Accounts instead of the basis of such property.

"**Competing Business**" shall mean any Person engaged, directly or indirectly, in the project or construction management business in the United States, Canada or in any other country that is material to the business of the Company as then conducted.

"**Confidential Information**" means information not ordinarily known by non-Company personnel, and includes, without limitation, such information as (i) confidential knowledge, trade secrets, ideas, data, programs, works of authorship, know-how, improvements, discoveries, designs and techniques, (ii) sensitive information the Company receives from its customers or receives from a third party under obligation to keep confidential; (iii) technical information related to the Company's existing and future products and services; (iv) confidential marketing information (including marketing strategies, customer names and requirements and product and services, prices, margins and costs); (v) confidential future service plans; (vi) confidential financial information; and (vii) other confidential business information which is generally not known to the public.

"**Deficit Capital Account**" means the deficit balance, if any, in a Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

      (a)     credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Regulations after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Regulations) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Regulations); and

      (b)     debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with

those provisions.

"**Department of State**" means the Department of State of Delaware.

"**Depreciation**" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction from such year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Operating Board.

"**Equity Interests**" is defined in Section 3.3 of this Agreement.

"**GAAP**" means generally accepted accounting principles, consistently applied.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Unit Holder to the Company shall be the gross fair market value of such asset, as determined by the contributing Unit Holder and the Operating Board;

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Operating Board, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Unit Holder in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Unit Holder of more than a de minimis amount of Company assets, including money, as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to the preceding clauses (i) and (ii) shall be made only if the Operating Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Unit Holders in the Company;

(c)     The Gross Asset Value of any Company asset distributed to any Unit Holder shall be the gross fair market value of such asset on the date of distribution; and

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and the definition of "Capital Account" herein.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to any of the foregoing subparagraphs (a), (b) or (d) of this Section, such Gross Asset Value shall

thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Independent Third Party**" means any Person who, immediately prior to a contemplated Sale of the Company, does not own in excess of 5% of Units (on a fully diluted basis), who is not controlling, controlled by or under common control with any such 5% owner of Units and who is not the spouse or descendent (by birth or adoption) of any such 5% owner of Units.

"**Invested Capital**" means the aggregate capital contribution in Units made by a holder thereof.

"**Involuntary Withdrawal**" means, with respect to any Member, the occurrence of any of the following events:

      (i)     the Member (a) makes an assignment for the benefit of creditors; (b) files a voluntary petition of bankruptcy; (c) is adjudicated a bankrupt or insolvent; (d) files a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation; (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in subsections (a) through (d); or (f) seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

      (ii)    if a proceeding is started against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, or similar relief under any statute, law or regulation, and that proceeding is not dismissed within 120 days;

      (iii)    if a trustee, receiver, or liquidator is appointed for the Member or for a substantial part of his properties, without the Member's consent or acquiescence, and such appointment is not vacated or stayed within 90 days;

      (iv)    if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

      (v)    if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

      (vi)    if the Member is an individual, his or her death, total and permanent disability or legal incompetency; or

"**Majority Holders**" means the Members holding more than 50% of the aggregate outstanding Units.

"**Member**" means (i) each Person signing this Agreement as a Member, and (ii) any Person who subsequently is admitted as a Member of the Company pursuant to <u>Section 7.3</u> below.

"**Operating Board**" is defined in <u>Section 6.1</u> of this Agreement.

"**Permitted Transferee**" with respect to a Person means (i) any other Member, (ii) for any Member who is a natural person, such Member's spouse, parents, brothers, sisters and descendants (all whether natural or adoptive), (iii) any trust solely for the benefit of a Member who is a natural person and/or such Member's spouse, parents, brothers, sisters and descendants (all whether natural or adoptive), (iv) any Affiliate of such Person, or (v) the Company.

"**Person**" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"**Profits and Losses**" means the income or losses of the Company as determined in accordance with the method of accounting followed by the Company for Federal income tax purposes, including, any separately stated items under Code Section 702(a).

"**Regulations**" means the United States Treasury Regulations, as amended from time to time.

"**Repurchase Notice**" is defined in <u>Section 7.6</u> of this Agreement.

"**Repurchase Option**" is defined in <u>Section 7.6</u> of this Agreement.

"**Repurchase Price**" is defined in <u>Section 7.6</u> of this Agreement.

"**Sale of the Company**" means the sale of the Company to an Independent Third Party or affiliated group of Independent Third Parties pursuant to which such party or parties acquire (i) a majority of Units in the Company (whether by sale of Units or merger or otherwise), or (ii) all or substantially all of the Company's assets, determined on a consolidated basis.

"**Subsidiary**" means any entity controlled by the Company, either directly or through one or more Subsidiaries.

"**Transfer**" means any sale, disposition, assignment, pledge, hypothecation, encumbrance or other direct or indirect transfer of any Unit or any interest therein.

"**Unit**" means an ownership unit in the Company, but shall not include any option or warrant to acquire any Units unless and until exercised pursuant to the terms thereof.  Units are owned by Members as set forth on <u>Schedule A</u> hereto, as amended from time to time.

"**Unit Holder**" means any Person who holds any Units, whether as a Member or as an unadmitted assignee of a Member.

"**Unit Holder Minimum Gain**" means the gain (regardless of character) which would be realized by the Company if property subject to a "partner nonrecourse debt" (as such term is defined in Section 1.704-2(b)(4) of the Regulations) were disposed of in full satisfaction of such

debt on the relevant date. The adjusted basis of property subject to more than one partner nonrecourse debt shall be allocated in a manner consistent with the allocation of basis for purposes of determining Company Minimum Gain under this Agreement.

"**Withdrawal**" is defined in Section 7.6 of this Agreement.

# ARTICLE II
## ORGANIZATIONAL MATTERS

Section 2.1    Name of the Company.  The name of the Company is "Espire Ads LLC." The Company may do business under that name and under any other name or names which the Operating Board selects subject to the Act.

Section 2.2    Purpose.  The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 2.3    Term.  The term of the Company began upon the filing of the Articles of Organization with the Department of State and shall continue indefinitely, unless sooner terminated as provided in this Agreement.

Section 2.4    Registered Office and Agent.  The address of the registered office of the Company in the State of Delaware is Legal Zoom.  The name and address of the registered agent of the Company for service of process in the State of Delaware is Legal Zoom.

# ARTICLE III
## CAPITAL AND CONTRIBUTIONS

Section 3.1    Units.  Unless otherwise decided by the Operating Board, the Company shall issue one type of Unit, with such rights, preferences and obligations as set forth in this Agreement.  Holders of Units shall be entitled to one vote per Unit held; provided that such Unit Holder is also a Member. Notwithstanding anything to the contrary herein, no Person shall be entitled to vote with respect to any Units unless such Person is a Member.  All Units issued hereunder from time to time shall be represented by a Certificate of Units issued by the president, secretary or assistant secretary of the Company.

Section 3.2    Initial Capital Contributions.  Upon the execution of this Agreement, the Members shall contribute to the Company cash and other assets in the amounts set forth on Schedule A hereto.

Section 3.3    Additional Capital Contributions.  The Company will not issue, or commit to issue, and will not permit any Subsidiary to issue or commit to issue equity interests in such Subsidiary, or Units or rights, options or warrants to purchase Units (or equity interests in such Subsidiary) or to purchase securities that may become convertible into, exchangeable for or exercisable for Units (or equity interests in such Subsidiary) or securities convertible into, exchangeable for or exercisable for Units (or equity interests in such Subsidiary), or notes or debt securities containing equity or profit participation features, or equity appreciation rights or phantom equity rights (all of the foregoing collectively, "**Equity Interests**"), except with the

prior written consent of the Operating Board.  If at any time the Operating Board deems it to be in the best interest of the Company to raise additional equity capital to properly carry out the Company's business and operations, the Operating Board shall have the right to raise additional equity capital for infusion into the Company by causing the Company to issue Units to one or more Persons, and to admit the persons investing such capital as additional Members.  No Member shall be required to make any capital contributions to the Company except as provided in Section 3.2.

Section 3.4    Capital Accounts; Return of Capital.  A separate Capital Account shall be maintained for each Unit Holder.   Members shall not be paid interest on their capital contributions to the Company.  No Unit Holder shall be entitled to a return of its Invested Capital except as provided for in this Agreement and, in any event, only to the extent that cash or other property of the Company is available therefor.  If a Unit Holder is to receive a return of a capital contribution, the Unit Holder shall not have the right to receive anything but cash in return of such Unit Holder's capital contribution.  No Member shall be required to restore any negative Capital Account.

Section 3.5    Loans.  If the Operating Board so approves, any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Operating Board and such Member agree.

Section 3.6    Options.  Notwithstanding anything herein to the contrary, the Operating Board may from time to time:  (i) issue to employees or consultants of the Company and to members of the Operating Board Additional Units having an exercise or purchase price, as the case may be, and such other terms and conditions, as determined by the Operating Board, in its sole discretion; and (ii) issue Additional Units pursuant to such option plans as may be adopted and approved by the Operating Board and the Members.

## ARTICLE IV
## DISTRIBUTIONS AND REDEMPTIONS

Section 4.1    Distributions Generally.  Subject to the provisions of this Article IV, the Operating Board shall have the right to determine whether, and to what extent, distributions shall be made by the Company to the Unit Holders.

Section 4.2    Distributions.  When and to the extent the Operating Board determines in its sole discretion that, after providing for the Company's present and anticipated debts and obligations, capital needs, expenses and reasonable reserves for contingencies, it is appropriate and in the best interests of the Company to make distributions, such distributions shall be made to the Unit Holders on a pro rata basis in accordance with each Unit Holder's percentage ownership of Units.

Section 4.3    Distributions with Respect to Tax.  The Company shall distribute sufficient cash to the Unit Holders, in an amount equal to the net Company taxable income (not including amounts constituting guaranteed payments under Code Section 707(c)) allocated to each Unit Holder for such year (less the aggregate amount of Losses in excess of the aggregate amount of Profits for all prior taxable years allocated to such Unit Holder) times the highest

marginal Federal and California or other states income tax rates of the shareholders of the company for such year applicable to an individual. Such distribution shall be paid with respect to a taxable year of the Company within 90 days after the end of such taxable year, or at such earlier times and in such amounts as determined in good faith by the Operating Board to be appropriate to enable the Unit Holders to pay estimated income tax liabilities. Distributions made pursuant to Section 4.2 shall serve to discharge the Company's obligations under this Section 4.3 and distributions required by this Section 4.3 shall reduce amounts distributable pursuant to Section 4.2, such that the aggregate amounts distributable to each of the Unit Holders pursuant to Section 4.2, and Section 4.3 shall be equal to the amount that would have been distributable to each such Unit Holder under Section 4.2, as if Section 4.3 was not in effect.

Section 4.4     In-Kind Distributions.  At any time, and from time to time, in the sole discretion of the Operating Board, the Company may distribute to its Unit Holders securities or other property held by the Company; provided, that any such distribution shall not satisfy any of the Company's obligations pursuant to Section 4.3 above.  To the extent the Operating Board determines in its sole discretion to distribute such property, the property will be distributed among the Unit Holders in the same proportions as cash equal to the fair market value of such property (as determined in the reasonable good faith judgment of the Operating Board) would be distributed among the Unit Holders pursuant to Section 4.2.  The Operating Board may require as a condition of distribution of securities hereunder that the Unit Holders execute and deliver such documents as the Operating Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws which apply to such distribution and any further transfer of the distributed securities, and may appropriately legend the certificates which represent such securities to reflect any restriction on transfer with respect to such laws.

## ARTICLE V
## ALLOCATIONS OF PROFITS AND LOSSES

Except as otherwise required by Code Section 704 and the regulations thereunder, Profits and Losses for any Fiscal Year shall be allocated among the Unit Holders as follows:

Section 5.1     Allocation of Profits and Losses.  After giving effect to the special allocations set forth in Section 5.2(a) through Section 5.2(e) inclusive, Profits and Losses shall be allocated among the Members as follows:

(a)     Profits.  Profits of the Company shall be allocated among the Unit Holders as follows:

(i)     First, to each Unit Holder pro rata and in proportion to the cumulative Losses, if any, allocated to such Unit Holder pursuant to Section 5.1(b)(ii)hereof until the cumulative Profits allocated to such Unit Holder under this Section 5.1(a)(i) equals the cumulative Losses allocated to such Unit Holder under Section 5.1(b)(ii) hereof; and

(ii)     Then, the balance, if any, to the Unit Holders in accordance with their respective Units.

(b)     Losses.

(i)     Losses of the Company shall be allocated to the Unit Holders in accordance with their respective Units; and

(ii)     Notwithstanding the foregoing, the allocation of Losses to any Unit Holder shall not exceed the maximum amount of Losses that can be allocated to a Unit Holder without causing that Unit Holder to have a Deficit Capital Account balance. If some but not all of the Members would have a Deficit Capital Account as a consequence of an allocation of Losses pursuant to this Section, the limitations set forth in this Section shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under the Regulations.

Section 5.2     Special Allocations to Capital Accounts and Certain Other Income Tax Allocations.  Items of income, gain, loss or deduction shall be allocated in accordance with the provisions of this Section 5.2 without regard to the allocation provisions of Section 5.1 and in the following order:

(a)     Notwithstanding any other provision of this Section 5.2, if there is a net decrease in the Company Minimum Gain as defined in either Regulation Section 1.704-2(d) or in the definition of Unit Holder Minimum Gain during a taxable year of the Company, then the Capital Accounts of each Unit Holder shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Unit Holder's share of the net decrease in Company Minimum Gain or Unit Holder Minimum Gain, as applicable.  This Section 5.2(c) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Regulations and shall be interpreted consistently therewith.  If in any taxable year that the Company has a net decrease in the Company Minimum Gain or there is a net decrease in Unit Holder Minimum Gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Unit Holders and it is not expected that the Company will have sufficient other income to correct that distortion, the Operating Board may in its discretion (and shall, if requested to do so by a Unit Holder) seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(b)     In the event any Unit Holder receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6) of the Regulations, which unexpectedly create or increase a Deficit Capital Account of such Unit Holder, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially allocated to such Unit Holder in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible, provided that an allocation pursuant to this Section shall be made if and to the extent that the member would have a Deficit Capital Account after all other allocations provided for in this Article V have been tentatively made as if this Section 5.2(b) were not in this Agreement.  It is the intent that

this <u>Section 5.2(b)</u> be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Regulations.

(c)      In the event any Unit Holder would have a Deficit Capital Account at the end of any Company taxable year, the Capital Account of such Unit Holder shall be specially credited with items of income (including gross income) and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section shall be made if and to the extent that the member would have a Deficit Capital Account after all other allocations provided for in this <u>Article V</u> have been tentatively made as if this <u>Section 5.2(c)</u> were not in this Agreement.

(d)      Items of Company loss, deduction and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company are characterized as member nonrecourse deductions under Section 1.704-2(i) of the Regulations and shall be allocated to the Unit Holders' Capital Accounts in accordance with Section 1.704-2(i) of the Regulations.

(e)      Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Regulations) such deductions shall be allocated to the Unit Holders in the same manner as Profits or Losses are allocated for such period.

(f)      In accordance with Section 704(c)(1)(A) of the Code and Section 1.704-1(b)(2)(I)(iv) of the Regulations, if a Unit Holder contributes property with a Gross Asset Value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes (and not for Capital Account purposes), be allocated among the Unit Holders so as to take account of any variation between the adjusted basis of such Property to the Company and its fair market value at the time of contribution in accordance with Code Section 704(c) using any allocation method selected by the Operating Board.

(g)      All recapture of income tax deductions resulting from sale or disposition of Company property shall be allocated to the Unit Holder(s) to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Unit Holder is allocated any gain from the sale or other disposition of such property.

(h)      Any credit or charge to the Capital Accounts of the Unit Holders pursuant to <u>Sections 5.2(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u> and/or <u>(e)</u> hereof shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to <u>Section 5.1</u>, so that the net amount of any items charged or credited to Capital Accounts pursuant to <u>Sections 5.1</u> and 5.2<u>(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u> and/or <u>(e)</u> shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account for each Unit Holder pursuant to the provisions of this <u>Article V</u> if the special allocations required by <u>Sections 5.2(a)</u>, <u>(b)</u>, <u>(c)</u>, and/or <u>(e)</u> hereof had not occurred.

(i)      If the Company incurs liability for any state tax, the amount of which is dependent upon the tax character of some or all of the Members (a "**State Replacement Tax**"), for a taxable year or any portion thereof with respect to which the Company also

realizes savings with respect to the amount of any additional State Replacement Tax that would have been imposed on the Company for such period but for the fact that some of the Members are themselves subject to the State Replacement Tax, then items of Loss or deduction attributable to the Company's State Replacement Tax expense shall be allocated to the Members that are not themselves subject to the State Replacement Tax for such period and such allocation shall be made in proportion to the amount of Profits allocated to such Members for the period with respect to which such State Replacement Tax is imposed. The principles of this Section 5.2(i) shall also apply if the Company is subject to any other tax, the computation of which depends in whole or in part upon the character of the Members.

Section 5.3    Reallocation by the Operating Board. The allocation of Profits and Losses in Section 5.1 is intended to have substantial economic effect within the meaning of Regulations Section 1.704-1(b)(2) or be in accordance with the Unit Holders' interests in the Company within the meaning of Regulations Section 1.704-1(b)(4). If subsequent events cause, in the reasonable opinion of the Operating Board, the Section 5.1 allocations to have neither substantial economic effect nor be in accordance with the Unit Holders' interests in the Company, the Operating Board may (a) allocate the income, gain, loss, deduction and credit of the Company so that such allocations are in accordance with the Unit Holders' interest or (b) subject to Section 11.4, make such other modifications to this Agreement (including, but not limited to, the addition of minimum gain chargeback, qualified income offset and other special allocation provisions specified in Regulations Sections 1.704-2 or 1.704-1(b)) that are necessary in the reasonable opinion of the Operating Board to cause such allocations to have substantial economic effect within the meaning of Regulations Section 1.704-1(b)(2).

Section 5.4    Tax Allocations. Except as otherwise provided in this Agreement, all items of income, gain, loss and deduction shall be allocated, for federal and state income tax purposes, among the Unit Holders in the same manner as the corresponding items of income, gain, loss and deduction are allocated for purposes of maintaining the Capital Account of each of the Unit Holders.

## ARTICLE VI
## MANAGEMENT POWER, RIGHTS AND DUTIES

Section 6.1    Management.

(a)    Management; General Powers. The business and affairs of the Company shall be managed by the Members in their membership capacity through an Operating Board (the "**Operating Board**") which shall consist of no less than two and up to five individuals selected as provided below. Except as otherwise set forth herein or pursuant to applicable law, all powers of the Company shall be exercised by the Members through the authority of the Operating Board. Except as otherwise set forth herein, decisions by a majority of the Operating Board acting within its scope of authority shall be binding upon the Company, each Member, and each Unit Holder. The Operating Board shall have full, exclusive, and complete discretion, power, and authority, subject to any other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of

the Company, and to make all decisions affecting such business and affairs, including, without limitation to:

(i)     prepare or contract for the preparation of, all requisite reports on behalf of the Company;

(ii)     acquire by purchase, lease or otherwise, any real or personal property, tangible or intangible;

(iii)     sell or otherwise dispose of all or any portion of any Company assets;

(iv)     authorize agreements and contracts and to give receipts, releases, and discharges;

(v)     borrow money for and on behalf of the Company from banks, other lending institutions, Members or their Affiliates, all on such terms as the Operating Board determines, and in connection therewith, to hypothecate, grant security interests in and otherwise encumber to assets of the Company;

(vi)     issue and sell any Additional Units and admit such Persons as Members, upon such terms and for such consideration which the Operating Board, in its sole discretion deems appropriate;

(vii)     purchase liability, managers' and officers' and other insurance to protect the Company's properties and business;

(viii)     make any and all expenditures which the Operating Board, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and financing and operation of the Company;

(ix)     invest Company funds in any investment determined appropriate by the Operating Board;

(x)     to make any and all determinations with respect to the manner to which the Company votes any stock interest, partnership interest or other equity interest held by the Company, on any matter on which the Company possesses a right to vote;

(xi)     enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company; and

(xii)     direct or delegate any Person to take all actions and execute all documents or instruments as are necessary to carry out the intentions and purposes of the above duties and powers.

(b)    <u>Operating Board Composition</u>.  From and after the date of this Agreement, each Member will vote all of such Member's Units and any other voting securities of the Company over which such Member has voting control and will take all other necessary or desirable actions within such Member's control (whether in such Member's capacity as a Unit Holder, Member, member of the Operating Board, officer of the Company or otherwise, and including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company will take all necessary and desirable actions within its control (including calling special Operating Board and Member meetings), so that:

(i)    the authorized number of persons comprising the Operating Board will be established at five;

(ii)    each of the founding members shall be elected to the Operating Board, one of whom shall serve as the Chairman of the Operating Board;

(iii)    one representative designated by the Majority Members shall be elected by the Members to the Operating Board;

(iv)    the removal from the Operating Board (with or without cause) of any representative designated hereunder, will be at written request of the party or parties so entitled to designate such representative pursuant to the terms of this <u>Section 6.1(b)</u> but only upon such written request and under no other circumstances; and

(v)    in the event that any representative designated hereunder pursuant to subsections (ii) or (iii) of this <u>Section 6.1(b)</u> for any reason ceases to serve as a member of the Operating Board, the resulting vacancy on the Operating Board will be filled by a representative designated by the party entitled to designate the departing member pursuant to the terms of subsection (ii) or (iii), respectively, of this <u>Section 6.1(b)</u>.

(c)    <u>Meetings of the Operating Board</u>.  Meetings of the Operating Board shall be held at the principal place of business of the Company or at any other place that a majority of the members of the Operating Board determine.  In the alternative, meetings may be held by conference telephone, provided each member of the Operating Board can hear the others.  The presence of at least a majority of the members of the Operating Board shall constitute a quorum for the transaction of business.  Meetings shall be held at least once each quarter, or more often in accordance with a schedule established by the Operating Board.  In addition, any two or, in the event the Operating Board shall consist of more than three members, a majority of the members of the Operating Board may convene a meeting thereof at a designated place upon at least ten business days' prior written notice to the other members.  The Operating Board also may make decisions, without holding a meeting, by unanimous written consent of the members of the Operating Board.  Minutes of each meeting and a record of each decision shall be kept by a designee of the Operating Board and shall be made available to the Members upon request.  Decisions of the Operating Board shall require the approval of a majority of its members.

(d)     Officers.  The Operating Board may appoint officers of the Company in its sole discretion, which may include a chairman, a president, one or more vice presidents, a secretary, one or more assistant secretaries, a treasurer and one or more assistant treasurers.  Any number of offices may be held by the same person.  The Operating Board may choose such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Operating Board.  Officers may be removed by the Operating Board at any time, with or without cause.

(e)     Limitation on Authority of Members.  No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.  This Section 6.1 supersedes any authority granted to the Members pursuant to the Act.  Any Member who takes any action or binds the Company in violation of this Section 6.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

Section 6.2     Meetings of and Voting by Members.

(a)     A meeting of the Members may be called at any time by the Operating Board or the Majority Holders.  Meetings of Members shall be held at the Company's principal place of business or at any other place designated by the Majority Holders.  Not less than ten nor more than 90 days before each meeting, the Majority Holders shall give written notice of the meeting to each Member entitled to vote at the meeting.  The notice shall state the time, place and purpose of the meeting.  Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice that is filed with the records of Members' meetings, or is present at the meeting in person or by proxy.  Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of the Majority Holders constitute a quorum.  A Member may vote either in person or by written proxy signed by the Member or by his, her or its duly authorized attorney in fact.

(b)     Except as otherwise provided in this Agreement, the affirmative vote of the Majority Holders shall be required to approve any matter coming before the Members.  In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument executed by the Majority Holders.  Except as otherwise provided in this Agreement, wherever the Act requires majority consent to approve or take any action, that consent may be given in writing and, in all cases, shall mean, rather than the consent of a majority of Members, the consent of the Majority Holders.

Section 6.3     Personal Services; Compensation.  No Member shall be required to perform services for the Company solely by virtue of being a Member.  Except as provided herein, or unless approved by the Operating Board, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

Section 6.4     Other Business Interests.  Except as otherwise provided in Article X, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, of

any Affiliate of any Member, or of any member of the Operating Board, to conduct any other business or activity whatsoever, and Members shall not be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business; provided, however, that nothing in this <u>Section 6.4</u> shall affect or supersede any such restrictions imposed on a Member by any other contract or agreement to which both the Company and/or any of its Affiliates, and such Member are a party. The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings may or may not be at arm's length and on commercially reasonable terms, in each case as determined by the Operating Board, in their sole discretion.

Section 6.5 <u>Liability and Indemnification</u>. Neither the Operating Board nor any of its members, shall be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by them, or failure to act, within the scope of the authority conferred on the Operating Board by this Agreement, except for acts, or failures to act, constituting fraud, gross negligence, or an intentional breach of this Agreement. The Company shall indemnify the Operating Board and each of its members and each of the officers of the Company for any act performed by them with respect to Company matters, as and to the full extent permitted by California law. Amounts in respect of the indemnification provided hereunder may be advanced by the Company in the sole discretion of the Operating Board. Whenever any indemnification has been paid to or expenses advanced to any party, such occurrence shall be reported to the Members prior to or at the next notice of a meeting of Members.

Section 6.6 <u>Power of Attorney</u>.

(a) <u>Grant of Power</u>. Each Member constitutes and appoints the Chairman of the Operating Board, or such other person designated by the Operating Board if there is no Chairman, as the Member's true and lawful attorney-in-fact, and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file:

(i) articles of organization consistent with the terms of this Agreement;

(ii) all documents (including amendments to articles of organization) that the Attorney-in-Fact deems appropriate to reflect any written amendment, change or modification of this Agreement effectuated in accordance with <u>Section 11.4</u> below;

(iii) any and all other certificates or other instruments required to be filed by the Company under the laws of the State of California or of any other state or jurisdiction, including, without limitation, any certificate or other

instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of California;

     (iv)     one or more applications to use an assumed name; and

     (v)     subject to the provisions of <u>Section 8.1</u>, all documents which may be required to dissolve and terminate the Company and to cancel its Articles of Organization.

     (b)     <u>Irrevocability</u>.  The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the dissolution, death or disability of a Member.  It also shall survive the Transfer of a Unit, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge and file any documents needed to effectuate the substitution.  Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

## ARTICLE VII
## TRANSFERS OF UNITS; ADMISSION OF MEMBERS

Section 7.1    <u>Restrictions on Transfer</u>.  No Member may voluntarily or involuntarily Transfer any Units except Transfers (i) to a Permitted Transferee; (ii) pursuant to <u>Section 7.7</u> below, or (iii) with the prior consent of the Operating Board, which consent may be withheld in the sole and absolute discretion of the Operating Board, after first delivering to the Company an opinion of counsel (reasonably acceptable in form and substance to the Operating Board) that neither registration nor qualification under the Securities Act and applicable state securities laws is required in connection with such Transfer.  Any certificate representing Units will bear the following Legend:

     "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THEY MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THAT ACT AS TO SAID UNITS OR AN OPINION, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY AND GIVEN BY COUNSEL SATISFACTORY TO THE COMPANY, THAT SUCH REGISTRATION IS NOT REQUIRED. THE UNITS REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER SET FORTH IN THE OPERATING AGREEMENT OF THE COMPANY, A COPY OF WHICH OPERATING AGREEMENT CAN BE OBTAINED AT THE PRINCIPAL OFFICES OF THE COMPANY."

Section 7.2    Acceptance of Transfer.  No Transfer of Units shall be deemed effective, unless and until the transferee shall execute a written instrument, in a form reasonably satisfactory to counsel for the Company, agreeing to be bound by all of the terms and provisions of this Agreement and all amendments and supplements hereto, to the same extent and on the same terms as the transferor thereof.

Section 7.3    Admission of Members or Transfers of Economic Interests.  Upon the admission to the Company of a Member, the Operating Board shall amend this Agreement, and any Schedules hereto, to reflect such admission.  No transferee shall be admitted as a Member without the approval of the Operating Board, it being agreed that the Operating Board has the right, in its sole discretion, to withhold approval of any such transferee as a Member.  If a transferee of any Unit that is not admitted as a Member pursuant to the operation of this Article VII, such transferee shall instead succeed to the economic interests in the Company so transferred, be it profits, losses and/or capital, but shall not succeed to any other rights (including voting rights) of the transferor as a Member; and such non-transferred rights shall remain with the transferor so long as such transferor is alive and competent or maintains its existence, as the case may be.

Section 7.4    Withdrawal of Members.  No Member shall have the right to withdraw from the Company, except in the case of an Involuntary Withdrawal.  Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Member so withdrawing shall thereupon become a Unit Holder but shall not become a Member.

Section 7.5    Sale of the Company.

(a)    Approved Sale.  If the Majority Holders approve a Sale of the Company (the "**Approved Sale**"), then each Member and Unit Holder will consent to and raise no objections to the Approved Sale, and if the Approved Sale is structured as a sale of Units, then each Member and Unit Holder will agree to sell all of the Equity Interests on the same terms and conditions as approved by the Majority Holders.  Each Member and Unit Holder will take all actions which the Operating Board and the Majority Holders deem necessary in connection with the consummation of the Approved Sale.

(b)    Condition as to Consideration.  The obligations of the Members and Unit with respect to the Approved Sale are subject to the satisfaction of the following condition:  upon the consummation of the Approved Sale, each holder of Units will receive substantially the same form and amount of consideration for its Units sold, or if any such holder is given an option as to the form and amount of consideration to be received, all holders will be given the same option, unless, in either case, such holder of Units consents in writing to the contrary.

(c)    Expenses.  Each Member and any other holders of Equity Interests will bear their pro rata share (based upon the total number of Units sold) of the costs of any sale of Equity Interests pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all holders of Equity Interests and are not otherwise paid by the Company.  Costs incurred by Members and the other holders of Equity Interests, on their own behalf, will not be considered costs of the transaction contemplated hereunder.

Section 7.6     Repurchase Upon Withdrawal.

(a)     Repurchase Option.   If (i) any employee of the Company who is a Member ceases to be employed by the Company or a Subsidiary for any reason other than the death, total and permanent disability or legal incompetency of such Member or (ii) there occurs an Involuntary Withdrawal affecting a Member for any reason other than the death, total and permanent disability or legal incompetency of either such individual Member, the Equity Interests then held by such Member or any of such Member's Permitted Transferees shall be subject to an option to repurchase by the Company pursuant to the terms and conditions set forth in this Section 7.6 (the "**Repurchase Option**").

(b)     Repurchase Notice.   The Operating Board of the Company may elect to purchase all of the Equity Interests subject to the Repurchase Option by delivering written notice (the "**Repurchase Notice**") to the holder or holders of such Equity Interests within 90 days after the Withdrawal.

(c)     Mandatory Repurchase.   Upon the occurrence of (i) the Involuntary Withdrawal of an individual Member as a result of the death, total and permanent disability or legal incompetency of such Member, the withdrawing Member (or such Member's estate or representative, as the case may be) shall sell, and the Company shall purchase, all (but not less than all) of the Equity Interests held by such Member for the price and upon the other terms and conditions set forth in this Section 7.6 (a "**Mandatory Repurchase**").

(d)     Repurchase Price.   The repurchase price for each such Equity Interest subject to the Repurchase Option or a Mandatory Repurchase (the "**Repurchase Price**") will be equal to the "fair market value" of each such Equity Interest (after deducting any exercise price for any warrant, option or other convertible security) based on the going concern value of the Company.  For purposes of this Section, "fair market value" shall be determined by mutual agreement of the Company and the withdrawing Member (or such Member's estate or representative, as the case may be), but if such parties are unable to mutually determine such "fair market value" within 20 days of receipt by the withdrawing Member (or such Member's estate or representative, as the case may be) of the Repurchase Notice, in the case of a Repurchase Option, or within 60 days of the Withdrawal, in the case of a Mandatory Repurchase, then said "fair market value" shall be determined by a recognized business appraiser selected by mutual agreement of the Company and the withdrawing Member (or such Member's estate or representative, as the case may be).  If such parties cannot agree on an appropriate appraiser, the Company and the withdrawing Member (or such Member's estate or representative, as the case may be) shall each select one appraiser which two appraisers shall then select a third appraiser, and the "fair market value" shall be the average of the three appraisals.  In the case of one appraiser, all fees and expenses of the single appraiser shall be paid by the Company, and in the case of multiple appraisers, each party selecting an appraiser shall pay such appraiser's fees and expenses and the fees and expenses of the third appraiser shall be split evenly between such parties.

(e)  Closing.  Within 30 days after the determination of such Repurchase Price, the Company will purchase and the withdrawing Member (or such Member's estate or representative and/or Permitted Transferees, as the case may be) will sell their Equity Interest to the Company, free from all taxes, liens and charges at a mutually agreeable time and place.  At such closing of the repurchase of the Equity Interest, the Company will pay for the Equity Interest to be purchased pursuant to its Repurchase Option by delivery of a check or wire transfer of funds in an amount equal to at least one-third of the aggregate Repurchase Price and a note for the remaining aggregate Repurchase Price payable in up to two equal annual installments beginning on the first anniversary of such closing and bearing interest (payable annually) at a rate equal to two percentage points over the prime or corporate base rate then in effect at the largest bank headquartered in the State of Florida (as then determined by assets); provided that the Company will use reasonable efforts to make all such repurchases with a check or wire transfer of the full amount of the aggregate Repurchase Price at such closing.  The Company will be entitled to receive customary representations and warranties from the seller regarding such sale and to require all sellers' signatures to be guaranteed.

(f)  Insurance Proceeds.  Notwithstanding paragraph (e) of this Section 7.6, for any exercise of a Repurchase Option or any Mandatory Repurchase, if the Company is the beneficiary of any life or total disability insurance on the life of either the deceased Member or the totally and permanently disabled Member that is subject to the Withdrawal, an amount equal to the insurance proceeds or benefits received by the Company because of the death, total and permanent disability or legal incapacity of the withdrawing Member, if any, shall be paid in cash to the withdrawing Member (or such Member's estate or representative, as the case may be) as part of the Repurchase Price of such Equity Interests, and the balance of the Repurchase Price, if any, shall be paid pursuant to the note or as otherwise provided under paragraph (e) of this Section 7.6, provided that the proceeds of any such policy shall not be payable on account of the Repurchase Price until seven days after receipt thereof by or on behalf the Company. The closing of any repurchase under this Section 7.6 shall occur as provided herein whether or not any insurance proceeds have been received with respect to the death, total and permanent disability or legal incapacity of the withdrawing Member.

(g)  Restrictions.  Notwithstanding anything to the contrary contained in this Agreement, all repurchases of Equity Interests by the Company shall be subject to any applicable restrictions under applicable law or contained in any of the Company's debt and equity financing agreements.  If any such restrictions prohibit the repurchase of Equity Interests hereunder which the Company is otherwise entitled to make, the Company shall continue to have the right to make such repurchase within two years from the date of delivery of the Repurchase Notice when it is permitted to do so under such restrictions.

Section 7.7  Priority Rights of Company and Other Members.  Any Member proposing a transfer or assignment of his Equity Interests (other than an Approved Sale in connection with Section 7.5) to anyone other than a Permitted Transferee shall first notify the Company in writing of the details and signed by the transferee or assignee.  The Company, for the benefit of remaining Members, shall have the first right to acquire the Equity Interests of such Member

upon the same terms and conditions as have been offered by the proposed transferee or assignee. If the Company declines to exercise such option, the remaining Members desiring to participate may proportionately (or in such proportions as the remaining Members may agree) purchase such Units under the same terms and conditions offered by or to the proposed transferee or assignee; provided, however, that in no event shall any remaining Member purchase any such Units if such purchase would cause the Company to breach any of its obligations.

In order for a proposed transfer or assignment to be effective, it shall be evidenced in writing and signed by the proposed transferee or assignee and a copy of such document shall be delivered to the Company and the remaining Members for their review. The Company's right of first refusal to acquire the Equity Interests proposed to be transferred or assigned shall remain in effect for a period of 30 days following the Company's receipt of the written documentation evidencing the bona fide offer. The right of the remaining Members to purchase the Equity Interests of the transferring Member shall remain in effect for a period of 15 days after expiration of the Company's right of first refusal. If neither the Company nor the remaining Members elect to purchase the Equity Interests of the transferring Member within the permitted time, then the transferring Member shall have the right, for a period of 90 days, to transfer his or her Equity Interests to the proposed transferee or assignee on exactly the same terms and conditions as set forth in the written notice; provided, however, such transferee or assignee shall not become a Member of the Company except upon requisite approval of the Operating Board.

Section 7.8    <u>Additional Restriction</u>.  Notwithstanding any provision of this Agreement to the contrary, no Member shall be permitted, without the written consent of all other Members, to transfer any Units to any Competing Business.

## ARTICLE VIII
## DISSOLUTION OF THE COMPANY

Section 8.1    <u>Events of Dissolution</u>.  The Company shall be dissolved upon (a) the written agreement of the Operating Board and the Majority Holders; (b) administrative dissolution under the Act; or (c) judicial dissolution under the Act.

Notwithstanding anything else contained herein, the occurrence of an Involuntary Withdrawal shall not cause the Company to be dissolved, and the Members expressly intend that all events of Dissolution identified in the Act are waived and pre-empted by this Agreement, and, unless any statute or judicial decision holds any such event to be non-waivable, no such event with respect to any Member, including the last remaining Member, shall be considered to be an event causing dissolution.

Section 8.2    <u>Procedure for Winding Up and Dissolution</u>.  Upon dissolution of the Company, the Company shall be terminated and the Operating Board shall liquidate the assets of the Company.  The proceeds of liquidation shall be applied and distributed in the following order of priority:

> (i)    First, to the payment of the debts and liabilities of the Company (other than any loans or advances made by any of the Members to the Company) and the expenses of liquidation;

       (ii)     Second, to the creation of any reserves which the liquidating Members deem reasonably necessary for the payment of any contingent or unforeseen liabilities or obligations of the Company or Members (to the extent the Company is liable therefor) arising out of or in connection with the business and operation of the Company;

       (iii)    Third, to the payment of any loans or advances made by any of the Members to the Company; and

       (iv)    Fourth, to the Members in proportion to and to the extent of their positive Capital Account balances as of the date of the distribution, after giving effect to all contributions, distributions and allocations for all periods.

Section 8.3   <u>Filing of Articles of Dissolution</u>.  If the Company is dissolved, the Operating Board shall promptly file Articles of Dissolution with the Department of State.  If there is no Operating Board, the Articles of Dissolution shall be filed by the Members; if there are no remaining Members, the Articles of Dissolution shall be filed by the last Person to be a Member; if there are no remaining Members, or a Person who last was a Member, the Articles of Dissolution shall be filed by the legal or personal representatives of the Person who last was a Member.

## ARTICLE IX
## BOOKS AND RECORDS

Section 9.1   <u>Deposits</u>.  All funds of the Company and each of its Subsidiaries, where not otherwise employed, shall be deposited from time to time to the credit of the Company in such banks, trust companies or other depositories as the Operating Board may select.

Section 9.2   <u>Books and Records</u>.  The Company shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Articles of Organization and this Agreement and all amendments to the Articles of Organization and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state or local tax returns.  The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or such Person's duly authorized representative for any proper purpose at any and all reasonable times during normal business hours.

Section 9.3   <u>Annual Accounting Period</u>.  The annual accounting period of the Company shall be its taxable year.  The Company's taxable year shall be the twelve month period ending December 31 of each year, subject to the requirements and limitations of the Code.

Section 9.4   <u>Reports</u>.  Within 75 days after the end of each taxable year of the Company, the Operating Board shall cause to be sent to each Person who was a Unit Holder at any time during the accounting year then ended an annual financial statement, prepared by the Company's independent accountants in accordance with GAAP.  In addition, within 75 days

after the end of each taxable year of the Company, the Operating Board shall cause to be sent to each Person who was a Unit Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Unit Holder's income tax returns for that year.

Section 9.5    <u>Tax Matters Partner</u>.  The Operating Board shall select a Member to be the Company's "Tax Matters Partner" and, as such, shall have all powers and responsibilities provided in Code Section 6221, et seq. or such other provisions as may become applicable to limited liability companies.  The President of the Company (or such other officer of the Company as the Operating Board designates if there shall be a vacancy in the office of president) of the Company will serve as the Tax Matters Partner unless and until the Operating Board designates another person.

Section 9.6    <u>Tax Elections</u>.  The Operating Board shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754.  The decision to make or not make an election shall be at the Operating Board's sole discretion.

## ARTICLE X
## COVENANTS TO PROTECT GOODWILL

Section 10.1    <u>Non-Competition</u>.  As an essential ingredient of, and in consideration of, the Company issuing Units to each Minority Member, each Minority Member hereby covenants and agrees that, from the date such Person became a Member through the earliest of (a) the date which is two years after such person ceases to be a Member, (b) the date of dissolution of the Company pursuant to <u>Article VII</u> (such period, the "**Covenant Period**"), such Member will not, directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation or control of, be employed by, associated with or in any manner connected with, or render services or advice to, any Competing Business.

Section 10.2    <u>Non-Solicitation</u>.  Each Minority Member agrees that, for the Covenant Period, such Member will not, directly or indirectly, either for himself or any other Person, (a) solicit or induce or attempt to solicit or induce any employee, independent contractor, producer, agent or business partner of the Company or of any other Members to terminate such employee's relationship with the Company or such other Member, or otherwise interfere with or disrupt, or attempt to interfere with or disrupt, any such relationship; or (b) employ or otherwise engage as an employee, independent contractor or otherwise, any employee, independent contractor, producer, agent or business partner of the Company or any other Member.

Section 10.3    <u>Additional Acknowledgments and Agreements</u>.  Each Minority Member hereby acknowledges and agrees that the covenants set forth in this <u>Section 10.1</u> and <u>Section 10.2</u> are reasonable as to time, scope and area and are not unduly burdensome or such Minority Member.  Each Minority Member further acknowledges and agrees that the duration of the time periods set forth in <u>Section 10.1</u> and <u>Section 10.2</u> shall be extended by and for the term of any period during which such Minority Member is in material violation of any covenant set forth in <u>Section 10.1</u> or <u>Section 10.2</u>, as the case may be.  Finally, each Member agrees that if any provision of <u>Section 10.1</u> or <u>Section 10.2</u> is so broad, in time, scope, area, or otherwise as to be

unenforceable, such provision shall be interpreted to be only so broad as is enforceable. If, at the time of enforcement of <u>Section 10.1</u> and <u>Section 10.2</u>, a court shall hold that the duration, scope or area restrictions stated or implied herein are unreasonable, the parties agree that the maximum reasonable duration, scope or area shall be substituted for the stated or implied duration, scope or area.

Section 10.4   <u>Confidentiality</u>. Each Minority Member acknowledges that he or she may become privy to Confidential Information of the Company, and that any unauthorized use or communication of such Confidential Information to or for the benefit of third parties or for the benefit of such Minority Member could damage the business of the Company. Each Minority Member therefore agrees to hold secret and confidential all such Confidential Information and to not disclose, furnish or make accessible to anyone (other than in the regular course of business of the Company) any Confidential Information. Notwithstanding the foregoing, no Member shall be required to hold in confidence information that (i) is required by law or court order to be disclosed or (ii) becomes generally available to the public other than as a result of unauthorized disclosure by such Investor.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1   <u>Notices, Consents, etc</u>. Any notices, consents or other communications required to be sent or given hereunder by any of the Members shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) delivered by a recognized overnight courier service, with signed receipt requested, or (c) sent by facsimile transmission to each Member at the addresses as set forth on <u>Schedule A</u>, or at such other addresses as may be furnished in writing by such Member. Date of service of such notice shall be (x) the date such notice is personally delivered, (y) upon signed receipt by such Member after delivery by the overnight courier, if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

Section 11.2   <u>Public Announcements</u>. No Member shall make any public announcement or filing with respect to the transactions provided for herein without the prior consent of the Operating Board, unless such party has been advised by counsel such disclosure is required by applicable law. To the extent reasonably feasible, any press release or other announcement or notice regarding the transactions contemplated by this Agreement shall be made by the Operating Board or any other party designated by the Operating Board.

Section 11.3   <u>Severability</u>. Should any provision of this Agreement be held to be enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon each Member with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The Members further agree that any court or arbitrator is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the Members as embodied herein to the maximum extent permitted by law. The Members expressly agree that

this Agreement as so modified shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

Section 11.4    <u>Amendment and Waiver</u>.    This Agreement may be amended, or any provision of this Agreement may be waived by the Operating Board, except that additional Unit Holders may be added, from time to time, upon their execution of a counterpart of the signature page hereto, and the addition of such Unit Holder's name, address, and Units to <u>Schedule A</u> hereto. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other breach.

Section 11.5    <u>Documents</u>.    Each Member will execute all documents and take such other actions as the Operating Board may reasonably request in order to consummate the transactions provided for herein and to accomplish the purposes of this Agreement.

Section 11.6    <u>Counterparts</u>.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Members hereto.

Section 11.7    <u>Expenses</u>.    Each of the Members shall pay all costs and expenses incurred or to be incurred by it, him or her, as the case may be, in negotiating and preparing the Agreement and in closing and carrying out the transactions contemplated by this Agreement.

Section 11.8    <u>Governing Law</u>.    This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Agreement shall be governed by, the laws of the State of California, without giving effect to provisions thereof regarding conflict of laws.

Section 11.9    <u>Headings</u>.    The subject headings of Articles and Sections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

Section 11.10 <u>Assignment</u>.    Except as otherwise specifically provided herein, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

Section 11.11 <u>Entire Agreement</u>.    This Agreement, the Preamble and all the Schedules attached to this Agreement (all of which shall be deemed incorporated in the Agreement and made a part hereof) and all other agreements between or among any of the parties hereto dated of even date herewith set forth the entire understanding of the Members with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral, of the Members, and shall be modified or amended as provided herein.

Section 11.12  Third Parties.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 11.13  Interpretative Matters.  Unless the context otherwise requires, (a) all references to Articles, Sections or Schedules are to Articles, Sections or Schedules in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, and (c) words in the singular or plural include the singular and plural and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter.

Section 11.14  Construction.  Each Member hereto agrees that this Agreement is the product of negotiations between sophisticated parties and individuals, all of whom were represented by counsel, and each of whom had an opportunity to participate in, and did participate in, the drafting of each provision hereof.  Accordingly, ambiguities in this Agreement, if any, shall not be construed strictly or in favor of or against any party hereto but rather shall be given a fair and reasonable construction without regard to the rule of contra proferentum.

Section 11.15  No Partnership Intended for Non-Tax Purposes.  The Members have formed the Company under the Act and expressly do not intend hereby to form a partnership under the laws of any jurisdiction.  The Members do not intend to be partners one to another, or partners as to any third party.  To the extent any Member, by word or action, represents to another Person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

**[Signature page following this page.]**

IN WITNESS WHEREOF, the parties have executed, or caused this Amended and Restated Operating Agreement to be executed on the date first written above.

**Espire Ads LLC**

By:_____
Its: _____

_____
Lisa M. Navarro

By:_____
Its: _____

_____
Jonathon A. Melendez

By:_____
Its: _____

Erik C. Radtke

_____

By:_____
Its: _____

Justin Emert_____

By:_____
Its: _____

_____
John E. Radtke

By:_____
Its: _____

_____

# SCHEDULE A

# MEMBERSHIP UNITS

| Member | Initial Capital Contribution | Units |
|---|---|---|
| Lisa Navarro | $30,000 | 51,000 |
| Jon Melendez | $15,000 | 7,000 |
| Erik Radtke | $60,000 | 25,000 |
| Justin Emert | $5,000 | 7,000 |
| John Radtke/ Tekplan | $40,000 | 10,000 |
| Total | $150,000 | 100,000 |