UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ESPIRE ADS LLC, THE BLU MARKET, INC.,     1:21-cv-10623-JGK
ex rel. LISA NAVARRO, THE BLU MARKET
LLC, *ex rel.* LISA NAVARRO, and LISA
NAVARRO individually,     AFFIDAVIT IN SUPPORT
                Plaintiffs,     OF MOTION
    v.
TAPP MARKET INFLUENCERS, LLC, TAPP
INFLUENCERS CORP., THE BLU
MARKET, INC., THE BLU MARKET LLC,
STEVEN FORKOSH, BRENNAN KASTNER,
and JUSTIN EMERT,
                Defendants

------------------------------------------------------------x

STATE OF FLORIDA

COUNTY OF BROWARD

Justin Emert, being duly sworn, deposes and says:

1. I am a defendant in this action and make this affidavit in support of defendants' motion for to dismiss the first amended complaint (Exhibit 1).

JURISDICTION

2. Preliminarily, as set forth in the memorandum submitted herewith, I believe that there is no personal jurisdiction which can be asserted over me in New York.

3. My situation is the same as Brennan Kastner's. Although I am a member TAPP Market Influencers, LLC, with a business address in New York, I am located in Ft. Lauderdale, Florida.

4.  As TAPP is engaged in internet based activities, most of us who are involved, including myself, are able to easily work remotely, which is fairly typical in the industry.

5.  I am not a resident of New York State, own no property in New York State, and have not transacted business in New York State.  I live in Florida, I work from Florida and I have come to New York no more than 2 or 3 times in the past 3 years, far longer than the period in issue in this lawsuit.

6.  Attached as Exhibit 26 is my redacted driver's license and a sample utility bill.

7.  I also incorporate the points raised by Steven Forkosh in his affidavit and in the memorandum of law submitted herewith. Included therein is the fact that Espire is also appears to be barred from litigating in New York, having operated here initially without registration.

NAVARRO'S SCHEMES WHILE WITH BLU MARKET

8.  In addition to the issue of jurisdiction, I am also able to provide the court with background as to the actions of Lisa Navarro ("Navarro") with both Blu Market and with Espire.

9.  I began with Blu Market sometime in 2014. I was hired as a marketing manager, and shortly thereafter I was promoted to director of marketing.

10. As director of marketing, my responsibilities included overseeing management of 12,000 influencers, loading and modifying payouts, influencer data, marketing and advertising material to Blu Market's third party platform Tune on a daily

2

basis and the oversight of all overlays to third party platforms such as Tune for Blu Market desktop and mobile apps.

11. An overlay is the export of our logo and graphics into the Tune program to create the apps. An analogy would be the boxes used by pizza restaurants. Each store has their logo and graphic design printed onto boxes manufactured by third parties. No store has any right to the third party technology to create the box. We did the same thing with Tune and apps and still do.

12. Navarro had begun at Blu Market before me and had varying titles while there. Sometimes she listed herself as a senior vice president, other times she showed her position as Chief Operating Officer, whatever she felt like at the time.

13. During the course of our employment, her resentment of Steven Forkosh became increasingly apparent. In our private conversations, she would often make derogatory comments about him.

14. Eventually, she revealed that she was secretly forming a competing company (Espire) but was staying on at Blu Market until she was ready to leave.

15. She planned to pirate Blu Market's business plans, client information, influencer information, agreements and its money. It was her plan that we all would all continue to be paid by Blu Market (and even to steal its funds using her unsupervised banking access) while using the time she should have been devoting to Blu Market to plan her transition, then finally leaving without notice when everything was in place.

16. Navarro asked me to join and promised that if did, I would be made an equity partner of the new company.

17. Navarro had also subverted other Blu Market employees, Jon Melendez (her boyfriend at the time), Eric Radtke and Nick Dimartino. I am ashamed to admit that I signed on as well.

18. We all assisted in her efforts to divert Blu Market clients and information while ostensibly working for Blu Market. For example, Navarro had me get the chief technology officer of Blu Market export the list of 12,000 influencers for her use (Exhibit 4).

19. During this period, we helped Navarro secure the export of influencer information, client information, business plans and other Blu Market information she would use for Espire.

20. In addition, she bragged on a number of occasions that she was actually stealing funds from Blu Market which she used for Espire startup costs, such as registration with Tune, the third party tracking system used by Blu Market. Navarro repeatedly expressed her contempt of Steven Forkosh to all of us, bragging that Blu Market was effectively underwriting the creation of Espire right under Steven Forkosh's nose.

21. Blu Market had an excellent business model, pioneered and developed by its principal, Steven Forkosh, and had great success in establishing its brand. Her plan was to use all of the assets from Blu Market for Espire. This included information regarding influencers, advertising, contracts and the business model which Forkosh had pioneered. Navarro's intention was to create Espire as Blu Market 2.0.

22. Navarro also repeatedly assured all of us that there would be no repercussions from Forkosh against us for our misdeeds as she had been accumulating

embarrassing videos and photographs of Forkosh which she would publically disclose to his clients, family and friends if he took any action against us. I understand that later, during a Board dispute at Espire, Navarro made a similar threat that unless a Board member stopped investigating her improprieties, she would send his wife damaging photographs of a personal nature as well.

23. We left sometime in the middle of 2017. Navarro took great pleasure in the fact that on the Monday morning we left, Forkosh would arrive to an empty office without a clue as to what had happened. Leading up to the departure, I was instructed by Navarro to ignore Forkosh and to not respond to any of his inquiries. In addition to the information she exported while at Blu Market, Navarro told me that when we left, she looted Blu Market, removing a suitcase full of Blu Market physical files.

24. Navarro did make me a member of Espire. Attached as Exhibit 15 is the operating agreement which I had been provided, including the Espire ownership list. I do not have the executed agreement and am locked out of my Espire email where it would have been.

25. Navarro's lack of integrity became that much worse once she was in charge of Espire.

26. Annexed as Exhibit 16 is a report, researched and drafted by John Radtke, one of the other equity owners at Espire, detailing Navarro's misdeeds after his complaints about her misconduct, including the use of Espire as her personal piggy bank, fell on deaf ears.

27. At Espire, we took full advantage of the information taken from Blu Market. We used its business model, we used Tune, we used the same forms it had

developed for its contracts. We used information about the contracts it had with advertisers and influencers and we used information about the advertisers and influencers to solicit both advertisers and influencers. At first, using Blu Market information, Espire was very successful.

28. However, in 2018, Espire began a downward spiral. Key clients were lost, payroll were not was not made and Navarro was discovered to have engaged in a variety of fiscal improprieties. She was using corporate funds for personal benefits, living expenses, rental on her Manhattan high loft apartment, her personal vehicle, vacations, expensive hotels and the like.

29. Moreover, I have since learned that while the managing member of Espire, Navarro formed Kvrma which she apparently has used to divert business from Espire, in breach of her obligations to Espire and the other equity owners.

30. A Board meeting was held for the purpose of removing Navarro as CEO based upon fiscal malfeasance and at that time, she was voted out. Despite our efforts, Navarro was able to remove $200,000 from the corporate accounts. She then retained counsel and successfully challenged the vote because the notice of the meeting had been one day short.

31. A second vote did not pass, with a vote of 2 to 2, after which she had free reign to continue her improprieties.

32. I had many confrontations with Navarro about her misconduct and as a result, for about two months toward the end of 2020, Navarro did not pay me the compensation due to me.

33. However, I do not believe she had the right to unilaterally withhold compensation and was in breach of the operating agreement. Article VI of the operating agreement provides that the Operating Board shall be 5 persons and each of the original investors, or their designee, shall be elected as an board member.

34. Board authority includes payment of compensation and hiring and firing.

35. Board decisions require majority approval.

36. I know of no Board meeting called to discuss my compensation and withholding my compensation was in breach of the operating agreement.

37. Finally, in November 2020, after going without compensation for two months, Navarro paid me $10,000 which covered the back salary I was due and emailed me that I was terminated. Again, I do not believe she had the authority to do so for the same reasons set forth above.

38. That letter was sent to my Espire email after which I was immediately locked out with no opportunity to respond.

39. To the best of my knowledge, my Espire equity interest was not purchased.

40. After I left Espire, Steven Forkosh and I reconciled and I began work for Blu Market and later for TAPP.

41. Despite having wrongfully severed my relationship with Espire, plaintiffs contend that I am subject to a restrictive covenant. The covenant, set forth in the operating agreement at section 10.1, precludes me from engaging in the influencer advertising business for 2 years after I cease to be a member.

42. As set forth in the accompanying memorandum of law, Espire should not be permitted to enforce the restrictive covenant when (a) it breached the operating

agreement, (b) the absolute bar from competition for two years is excessive and completely prevents me from working in my field of endeavor and (c) preventing me from working with Steven Forkosh, from whom Espire stole its business and clients, is unconscionable.

_____
JUSTIN EMERT

Sworn to me
April, 2022

State of Florida · County of Broward
The foregoing document was acknowledged before me
on this 14th day of 04, 2022,

Notary _____

JEAN EDOUARD
NOTARY PUBLIC · STATE OF FLORIDA
NO. HH 222769
My Comm. Expires 8/30/2024

8