# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- x
                                                        :
TAPP MARKET INFLUENCERS, LLC, TAPP                      :
INFLUENCERS CORP., THE BLU MARKET                       :
INC. and STEVEN FORKOSH,                                :
                                                        :        Case No. 1:21-cv-11068
                           Plaintiffs,                  :
                                                        :        Consolidated With
             - against -                                :        Case No. 1:21-cv-10623
                                                        :
ESPIRE ADS LLC, KVRMA LLC, LISA                         :        JURY TRIAL DEMANDED
NAVARRO, NATHANIEL CO, CHARLES                          :
PUNAY, CPA VIRAL LLC D/B/A TAPMOB, and                  :
JASPER PANGILINAN,                                      :
                                                        :
                           Defendants.                  :
------------------------------------------------------- x
```

## SECOND AMENDED COMPLAINT

Plaintiffs TAPP Market Influencers, LLC ("TAPP LLC"), TAPP Influencers Corp. ("TAPP Corp" and collectively with TAPP LLC, "TAPP"), The Blu Market Inc. ("Blu Market"), and Steven Forkosh ("Foskosh" and collectively, "Plaintiffs") allege for their second amended complaint against Espire Ads LLC ("Espire"), Kvrma, LLC ("KVRMA"), Lisa Navarro ("Navarro"), Nathaniel Co ("Co"), Charles Punay ("Punay"), CPA Viral LLC d/b/a Tapmob ("Tapmob"), and Jasper Pangilinan ("Pangilinan" and collectively, "Defendants"), as follows:

## NATURE OF THE CASE

1.       Plaintiff Steven Forkosh is a pioneer of the influencer marketing industry and the iconic founder of industry leaders Blu Market and TAPP.  In 2013, Forkosh founded Blu Market, which, under Forkosh's leadership rapidly grew to becoming an industry leader.  Following that rapid growth, Blu Market was described by *Inc. Magazine* as "an incredibly successful influencer marketing firm," which, at one time, had a reach of more than 300 million followers through its

influencer network.  Blu Market was also featured in *Forbes* and *The Wall Street Journal*, as well as other prominent news outlets.  The *Forbes* article included an interview from one of Blu Market's partners, who described the Blu Market team as having "huge energy, incredibly committed, hands-on, and [bringing with them] great product insight."

2.      Navarro—who previously worked as an administrator at a non-profit and never had worked in the social media industry in any capacity—joined Blu Market shortly thereafter and relied on Forkosh to train her in how the industry, and Blu Market, operated.  Navarro served as Forkosh's executive assistant until she eventually took on the self-proclaimed role of Blu Market's Chief Operating Officer, but, unbeknownst to Forkosh, Navarro had her sights set higher.

3.      Unbeknownst to Forkosh, Navarro embarked upon a scheme to misappropriate Blu Market's intellectual property and assets for the purpose of hijacking Blu Market's business.  In 2017, Navarro – after months of preparation and planning – executed on her scheme to steal Blu Market's business.  In July 2017, Navarro coaxed Blu Market's employees to leave the company en masse, and work for Espire with promises of equity in the business.  Worse yet, Navarro stole the client lists, client contracts, and other intellectual property that had positioned Blu Market as an industry leader.  Navarro—aware of the illegality of her conduct—likewise stole the physical copy of her executed employment agreement with Blu Market.  To ensure that Blu Market would not compete with her new business, Navarro also engaged in thug-like, extortive tactics, resorting to (i) directing her boyfriend, another Blu Market employee, to threaten physical violence on Forkosh and his family if Forkosh pursued Navarro for her illegal conduct; and (ii) threatening to disseminate compromising videos and photographs of Forkosh if he attempted to pursue her illegal conduct.  Finally, Navarro convinced Defendant Co, a previous employee of Blu Market, to work

2

for Navarro at Espire, which plainly constituted a breach of the non-competition provision contained in his settlement agreement with Blu Market.

4.      In response to this betrayal and threats against his family, Forkosh briefly left the industry and focused on other endeavors.  While Forkosh was out of the industry, Navarro engaged in rampant wrongdoing—exploiting Blu Market's intellectual property and assets to run Espire, founding KVRMA to spin-off Espire's business away from the reach of its creditors, and defaming Forkosh throughout the industry.

5.      Subsequently, in June 2020, Forkosh decided to re-enter the industry and began rebuilding Blu Market from the ground up.  After becoming aware of Forkosh's efforts with Blu Market, and cognizant that Navarro's own businesses were crumbling without Forkosh's leadership and industry acumen, on August 29, 2020, Navarro agreed to enter into framework for a joint venture with Forkosh (the "Framework Agreement").  Specifically, the Framework Agreement contemplated an agreement by which Forkosh would transfer 50% of Blu Market to Navarro in exchange for her transferring 50% of Espire to him, making them each 50-50 owners in a partnership built around those companies.

6.      Unbeknownst to Forkosh and Blu Market, the Framework Agreement was premised on rampant material misrepresentations by Navarro and Espire.  Indeed, contrary to explicit representations by Navarro and Espire, Navarro was not the 100% owner of Espire and lacked the contractual right to authorize a transfer of a 50% interest in the company to Forkosh. Upon learning of the deceit, Forkosh demanded—and Navarro assented to—the rescission of the agreement.

7.     Shortly thereafter, in 2020, Forkosh founded a new company, TAPP.  Since that time, TAPP has rapidly grown and become an industry leader with thousands of affiliate influencers in its network.

8.     Rather than compete with Forkosh and TAPP in an open market, Defendants, led by Navarro, determined to enter into a defamatory campaign against Plaintiffs.  The defamatory campaign included the filing of the related *Espire Ads LLC, et al. v. TAPP Influencers Corp., et al.*, No. 1:21-cv-10623 (S.D.N.Y.) action (the "Espire Action"), which is premised on numerous false representations and claims.  It further included statements to TAPP and Forkosh's clients, influencers, and other acquaintances, claiming, among other things, that they are "thieves" who stole from Navarro, hacked her systems, and tried to not pay its influencers.  Navarro also engaged in an Instagram Live session before 2,500 viewers in which she repeated many of these false accusations.  In fact, it was Navarro who stole from Blu Market, and is even recorded on camera touting that she diverted company funds without Forkosh's permission and "bounced."

9.     Through Defendants' conduct, they have acted maliciously seeking to interfere with Plaintiffs' existing contracts, keep Plaintiffs from entering into prospective business relations, and defame Plaintiffs to such an extent that they will be unable to compete in the industry. Plaintiffs have suffered tens of millions of dollars in damages as a result of this tortious conduct as well as Defendants' various breaches of contract.

10.     Accordingly, Plaintiffs are entitled to, among other things, an award of compensatory and punitive damages, as well as a declaration that the Framework Agreement is *void ab initio*.  To the extent that the Court determines that the Framework Agreement is enforceable, Plaintiffs are entitled to rescission of the fraudulently-induced contract and/or damages arising from the breaches thereof, including related fiduciary duties.

## PARTIES

11.     Plaintiff TAPP Market Influencers, LLC is a New York limited liability company with its principal place of business at 400 Broome Street, 11th Floor, New York, New York 10013.

12.     Plaintiff TAPP Influencers Corp. is a New York corporation with its principal place of business at 400 Broome Street, 11th Floor, New York, New York 10013.

13.     Plaintiff The Blu Market Inc. is a New York corporation with its principal place of business at 400 Broome Street, 11th Floor, New York, New York 10013.

14.     Plaintiff Steven Forkosh is an individual residing in New York, New York.

15.     Defendant Espire Ads LLC is a Delaware limited liability company.

16.     Defendant Kvrma, LLC is a California limited liability company with its principal place of business at 3610 Central Avenue, Unit 42, Riverside, California 92506.

17.     Defendant Lisa Navarro is an individual residing in the State of California.

18.     Defendant Nathaniel Co is an individual residing in the State of California.

19.     Defendant Jasper Pangilinan is an individual residing in the State of California.

20.     Defendant Charles Punay is an individual residing in the State of California.

21.     Defendant CPA Viral LLC d/b/a Tapmob is a California limited liability company with its principal place of business at 9245 Dowdy Drive, Unit 213, San Diego, CA 92126.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 based on diversity jurisdiction because Plaintiffs are citizens of the State of New York and Defendants are citizens of the States of California and Delaware.  The Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction.

## FACTUAL BACKGROUND

### I.    FORKOSH FOUNDS BLU MARKET

24.    In June 2013, Forkosh founded Blu Market to capitalize on the emerging market for advertising through social media influencers.

25.    Initially, Blu Market focused on advertising through specific Instagram accounts, by creating, growing, and maintaining popular accounts (*i.e.*, "meme" accounts, including one devoted to hair, which Navarro later misappropriated).  Once each account reached a certain level of following, Blu Market would sell specific advertisements on the page to customers.  Blu Market eventually managed approximately 100 of these accounts at once.

26.    Shortly thereafter, Blu Market pivoted its model to focus on a subtler and less resource-intensive form of advertising—influencer advertising.

27.    Blu Market engaged in social media influencer advertising as an intermediary. Customers would engage Blu Market for purposes of advertising their product through social media.  Blu Market would, in turn, engage an "affiliate" or "influencer" on social media who would promote the product through their social media page(s) to their followers.

28.    Blu Market's "affiliates" (or "influencers") are independent contractors that it engages on a non-exclusive basis.

29.    For purposes of preparing the underlying analytics required to (i) demonstrate the reach of the advertising to Blu Market's customers, and (ii) calculate compensation for the influencers, Blu Market would use third-party software such as Tune.  Tune provided a proprietary tracking platform that allowed for an analysis of the project and clear records concerning which

influencers should be credited for which advertising projects and to generate periodic reports used for invoicing.

30.     Blu Market grew from a small business consisting of just Forkosh to include fifteen employees at its peak.  Among those employees were Co, Punay, and Pangilinan.

31.     Blu Market rapidly became an industry leader under Forkosh's stewardship.  In 2015, Blu Market also notably teamed up with Kevin Jonas, a well-known member of The Jonas Brothers music group, which expanded its influence even further.

32.     At its peak, under Forkosh's leadership, Blu Market grew to bringing in tens of millions of dollars in revenue per year, with a network of more than 9,000 influencers and a reach of more than 300 million followers.

## II.     NAVARRO JOINS BLU MARKET AND EXECUTES NON-DISCLOSURE AGREEMENT AND EMPLOYMENT AGREEMENT

33.     Navarro joined Blu Market during 2013 or 2014 as an employee.  Upon joining Blu Market, Navarro had no experience in the affiliate or influencer marketing industry.  Indeed, according to her LinkedIn page, Navarro's prior employment experience was as a Housing Coordinator at Riverside Housing Development (2009-2012) and as the Director of Purchasing at Century Crowell Communities (2001-2008).

34.     At the time that Navarro commenced her employment at Blu Market, she entered into a non-disclosure agreement with Blu Market (the "Non-Disclosure Agreement").  The Non-Disclosure Agreement was a common form contract that was signed by all employees of Blu Market without material changes to its terms.

35.     The Non-Disclosure Agreement provided, among other things, that: (i) each party agrees to hold Confidential Information in confidence and to not use or disclose it to a third party for a period of two (2) years from the date of initial disclosure of Confidential Information" (§ 4),

and (ii) "the Receiving Party shall protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care (including reasonable security measures), to prevent the unauthorized use, dissemination or publication of Confidential Information as the Receiving Party uses to protect its own confidential information of like nature" (*id.*).

36.     Section 1 of the Non-Disclosure Agreement further defined "Confidential Information" to mean "the proprietary information exchanged between the parties, which includes, without limitation, information (tangible or intangible) regarding a party's technology, designs, techniques, research, know-how, specifications, product plans, pricing, customer information, user data, current or future strategic information, current or future business plans, policies or practices, employee information, and other business and technical information which is (i) marked 'confidential' or 'proprietary' at the time of disclosure by the disclosing party (the 'Disclosing Party'); or (ii) by its nature or content is reasonably distinguishable as confidential or proprietary to the party receiving the Confidential Information (the 'Receiving Party')."

37.     Contemporaneous with Navarro's commencement of her employment at Blu Market and her execution of the Non-Disclosure Agreement, Blu Market and Navarro entered into an employment agreement (the "Employment Agreement").

38.     The Employment Agreement provided, among other things, that (i) "while employees are on Company time, they are expected to only work on Company projects," (ii) time spent on personal items will be considered time theft," and (iii) "resignation requires the employee to give written two weeks' notice to appropriate leadership, last day must be a full, in office work day, and all company property must be returned to the company."

39.     As detailed *infra*, Plaintiffs are no longer in possession of the original Non-Disclosure Agreement or Employment Agreement because Navarro stole the original copies from Blu Market's files when she left the company in the summer of 2017.

40.     After joining Blu Market, Navarro's responsibilities increased from initially serving as Forkosh's executive assistant to interfacing with clients and partners.  As her interactions with clients and partners gradually increased, Navarro took on the self-proclaimed title of Blu Market's Chief of Operations.  Ultimately, Navarro was charged with approving invoices and making payments on behalf of the company to employees, influencers, and vendors, which required that she be granted access to Blu Market's financial assets and records, influencer contacts, and clients.  Navarro was also responsible for overseeing social media accounts, monitoring and responding to comments from social media influencers, managing social media engagement events, and managing the general day-to-day affairs of the business.  These responsibilities required that Navarro have access to Blu Market's confidential and proprietary information, including its confidential business development plans, its confidential marketing plans, advertiser lists, affiliate lists, and various tools required to operate its business.  Specifically, Navarro had access to Blu Market's formatting tools, third-party layering tools, and networking tools.  Navarro also had access to Blu Market's confidential technology, internal logistical and operational procedures, business relations, financial information, contract templates, and software.

41.     Navarro also regularly interfaced with Blu Market's clients (*i.e.*, advertisers) and affiliates (*i.e.*, influencers).  For purposes of those interactions, Navarro was also provided with access to confidential information concerning Blu Market's clients and affiliates.

42.     The confidential information to which Navarro had access constitute trade secrets because the disclosure of that information, which was used in Blu Market's regular business

operations, would have provided Blu Market's competitors with an advantage over Blu Market if it were disclosed. As such, Plaintiffs took significant precautions to ensure that this information was not publicly disclosed. To that end, Plaintiffs employed best-in-class practices and policies to safeguard its trade secrets and the knowledge of how its trade secrets were developed. Blu Market's safeguards primarily consisted of internal cybersecurity policies and practices, physical barriers, and legal protections, such as non-disclosure agreements. Moreover, Plaintiffs only divulged the information to its employees on a need-to-know basis.

43.     As a result of Navarro's position, she had a need to know this information for purposes of her operational responsibilities. Navarro also had access to Blu Market's bank accounts and credit cards due to her operational responsibility to approve invoices and make payments on behalf of the company to employees, influencers, and vendors. Navarro was thus in a confidential relationship with Blu Market.

## III.     BLU MARKET TERMINATES CO AND PANGILINAN FOR FRAUD AND SELF-DEALING

44.     In Spring 2015, Blu Market became aware that Co and Pangilinan were engaging in fraud and self-dealing. As a result of that conduct, Blu Market terminated their employment.

45.     On June 1, 2015, Forkosh and Blu Market, on the one hand, and Co and Pangilinan, on the other hand, entered into a separation and termination agreement (the "Settlement Agreement").

46.     Section 4 of the Settlement Agreement provided:

> As of the Effective Date and for a period of at least six months thereafter, [Co and Pangilinan] will not hire, contact, or enter into a business relationship with any BLU Market affiliate, its officers, directors, employees, or subsidiaries, and should any such affiliates contact [Co and Pangilinan], [Co and Pangilinan] will refer them to BLU Market and provide details of such contact to BLU Market. For purposes of this paragraph, a 'BLU Market affiliate' is any person or entity that has done business with BLU Market or with

whom [Co and Pangilinan] made contact through BLU Market's database or associations.

47. Section 8 provided that it would "be governed by and construed in accordance with the laws of the State of New York without giving effect to principles of conflicts or choice of law."

48. Section 13 provided that "Each Party agrees that it will not disparage the other side."

## IV. NAVARRO EMBARKS UPON SCHEME TO HIJACK BLU MARKET'S BUSINESS AND IMPROPERLY EXPLOIT BLU MARKET'S INTELLECTUAL PROPERTY AND ASSETS

49. Unbeknownst to Forkosh, Navarro—motivated by knowledge of how lucrative Blu Market's business had become under Forkosh's leadership—embarked upon a fraudulent scheme to hijack Blu Market's business. In July 2017, after months of planning and preparation, Navarro executed on her scheme to steal Blu Market's business and launch Espire.

50. Upon information and belief, Navarro recruited Co and Punay to begin working for Espire shortly after its formation. Navarro subsequently turned other Blu Market employees, such as Justin Emert, Eric Radke, Nick Dimartino, and Alex Vazquez, and induced them to leave Blu Market and to join Espire in exchange for equity in Espire. Through her scheme, Navarro orchestrated having these employees steal Blu Market's trade secrets, including its business plans, marketing plans, pitch decks, influencer information, and Tunes files for the benefit of Espire. These confidential documents included Blu Market's price structures for clients and payment structures for affiliates. Navarro herself arranged for the export of a list of approximately 12,000 of Blu Market's influencer contacts so that she could use them for Espire's business.

51. Navarro and the employees then used their direct access to Blu Market's system to communicate directly with Blu Market's advertisers and influencers and to create systems and infrastructure for Espire that mimicked those used by Blu Market. For example, Navarro copied

Blu Market's contracts verbatim, and filed copyrights for desktop and mobile applications for Espire that are, upon information and belief, based on code and applications from Blu Market.

52.     Navarro and her conspirators then reached out to Blu Market's clients to advise them of a coming "transition" from Blu Market to Espire, while Navarro and her conspirators were still ostensibly employed by Blu Market.

53.     Navarro also used her access to Blu Market's bank accounts to entice Blu Market's influencers to come with her to Espire.  Specifically, Navarro used Blu Market credit cards to pay these influencers a premium to join Espire, and threatened that if the influencers chose to stayed at Blu Market, they would never be paid the money they were owed.  In total, Navarro and her conspirators caused approximately $750,000 in credit card debt to Forkosh and Blu Market.

54.     Navarro also used the pilfered funds to promote her interests and Espire's interests, to the direct detriment of Blu Market.  This included a PayPal disbursement of $5,000 to herself.

55.     After Navarro left in July 2017, Forkosh learned that she had illegally stolen hundreds of thousands of dollars, stripped Blu Market of customers, business opportunities, business models, internal logistical and operational procedures, certain technical tools, financial information, contract templates, confidential information concerning Blu Market's customers and affiliates, its employees, and its funds.

56.     Following the departure of Navarro and her conspirators, none of whom provided two weeks' notice of their resignation, Blu Market had no funds left to operate or to pay its debt and remaining employees.

57.     To cover her tracks, when leaving Blu Market, Navarro stole Blu Market's physical and electronic files.  Among other stolen items were the original copies of Navarro's Non-Disclosure Agreement and Employment Agreement, and approximately $15,000 in American

Express gift cards that were used in the business.  Not fearing any repercussions, Navarro and her boyfriend left a note in the place of the gift cards stating "looking for something?".

58.     Navarro and her boyfriend subsequently threatened Forkosh, informing him that if he ever took any actions against Navarro and challenge Espire's use of Blu Market's business, they would engage in physical violence against his family and would publicly defame him using what Navarro claimed were embarrassing photographs and videos that she had secretly taken of Forkosh for exactly that purpose.

## V.     PUNAY BEGINS WORKING FOR ESPIRE AND CONSPIRES AGAINST BLU MARKET WITH NAVARRO, ESPIRE, AND CO

59.     Punay, like other former Blu Market employees under Navarro's influence, began engaging in duplicitous work for Espire while still employed at Blu Market.

60.     As part of his employment at Blu Market, Punay entered into a confidential relationship with the company, through which he committed to maintain the confidentiality of its trade secrets.

61.     Despite ostensibly being a Blu Market employee until 2020, Punay violated that trust when he began simultaneously working at Espire in 2018.  Through his work at Espire, Punay capitalized on the information learned at Blu Market to his own and Espire's benefit and to Blu Market's direct detriment.

62.     Unbeknownst to Plaintiffs, Punay, Navarro, Co, and Espire began a campaign using Plaintiffs' trade secrets and intellectual property and defaming Plaintiffs with current and prospective advertiser clients and influencers.

63.     First, under Co's guidance and direction, they began directing fake traffic (VDOS) to Blu Market's influencer links that would cause Blu Market's site to crash.  They would then use

the crash to try to convince influencers that Blu Market was unreliable and that they should switch from working with Plaintiffs to working with Espire.

64.     Next, they embarked on a campaign where they advised current and prospective advertising clients and influencers that Plaintiffs were scam artists and stole intellectual property.

65.     Forkosh did not learn of their conduct until in or about June 2021.  Upon learning of the campaign, a cease and desist email was sent to Navarro and others.

## VI.     NAVARRO FORMS KVRMA AND CO FOUNDS TAPMOB

66.     In August 2019, Navarro formed two entities, one for-profit company, and one 501(c)(3) charitable organization, both called KVRMA.  Upon information and belief, Navarro has been at all times an owner of the two KVRMA entities, whether in whole or in part.

67.     The for-profit KVRMA entity is a company engaged in the same type of social media advertising as Espire (and, formerly, Blu Market), and it also designs and sells clothing lines.

68.     Upon information and belief, Navarro uses the 501(c)(3) KVRMA vehicle for avoiding creditor liabilities.  Specifically, Navarro transferred assets from Espire to KVRMA to avoid creditor liabilities, including the liabilities associated with this action.

69.     On April 22, 2020, Co founded CPA Viral LLC, which does business under the name Tapmob.

70.     Upon information and belief, Co and Pangilinian build KVRMA's website.  Tapmob utilizes a virtually identical website to KVRMA, both in terms of format and content, which it uses to solicit social media advertisers and influencers.

## VII.   THE PARTIES ENTER INTO A FRAMEWORK AGREEMENT BASED ON NAVARRO'S FRAUDULENT MISREPRESENTATIONS

71.   In July 2020, Navarro and Forkosh engaged in discussions in which Navarro expressed interest in doing business with Forkosh and agreed to destroy and/or deliver to Forkosh any of the compromising photographs and videos that she had of him.

72.   Forkosh was represented by counsel in negotiations with Navarro concerning a potential partnership.  Despite knowing that, in August 2020, Navarro sent a draft framework agreement directly to Forkosh, circumventing his counsel.  Navarro circumvented Forkosh's counsel in a transparent attempt to get him to enter into a framework agreement premised on false information.

73.   On August 29, 2020, Forkosh, Blu Market, Navarro, and Espire entered into the Framework Agreement, or an "agreement to agree," concerning a potential partnership.

74.   Through the Framework Agreement, Forkosh and Blu Market, on the one hand, preliminary agreed to provide Navarro with a 50% ownership interest in Blu Market, and Navarro and Espire, on the other hand, preliminarily agreed to provide Forkosh with a 50% ownership interest in Espire.

75.   In particular, the Framework Agreement provided that upon the execution of an "operating agreement" incorporating the material terms of the framework agreement (Framework Agreement, § 18), "Navarro and Forkosh *shall* enter into a 50% / 50% Partnership for 'The Compoany' [sic] Forkosh will retain 50% of Blu Market and Espire and Navarro will retain 50% of Blu Market and Espire."  (*Id*. § 4.)

76.   Upon information and belief, the proposed partnership framework and with it the Framework Agreement were premised on material misrepresentations made by Navarro and Espire.  In particular, Navarro induced Forkosh to enter into the Framework Agreement by

misrepresenting, both in advance of the execution of the agreement, and in the terms of the agreement itself, that Navarro was the sole owner of Espire and thus had the ability to transfer a 50% ownership interest in Espire to Forkosh.  Specifically, Navarro falsely represented that: (i) "Navarro is the sole owner and CEO of Espire" (Framework Agreement, § 2); (ii) that Navarro was able to provide Forkosh with a 50% ownership interest in Espire (*id.* § 4); (iii) that Navarro "has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions for the due authorization, execution, delivery and performance of this Agreement by it have been duly taken" (*id.* § 8(a)); and (iv) that Navarro's "authorization, execution, delivery and performance of this Agreement does not conflict with any other agreement or arrangement to which it is a party or by which it is bound" (*id.* § 8(c)).

77.     Navarro, however, was not the sole owner of Espire.  Indeed, the July 26, 2017 Amended and Restated Operating Agreement of Espire Ads LLC ("Espire Operating Agreement") reflected that Navarro owned only 51% of the membership units in the company.  Upon information and belief, between the execution of the Espire Operating Agreement and the Framework Agreement, Navarro transferred some of her ownership in the company, leaving her without even a majority stake.  As such, Navarro lacked the ability to, at minimum, enter into a 50-50 partnership with Forkosh, but also to transfer the requisite 50% interest in Espire to Forkosh.

78.     At the time that Navarro and Espire made these false representations, they knew them to be false and material to Forkosh, Blu Market, and overall proposed partnership.

79.     Indeed, when, on October 30, 2020, counsel for Forkosh emailed Navarro's counsel to note that he has become aware that Navarro "lacked the ability to even make the commitment to provide Mr. Forkosh with 50% of Espire," Navarro's counsel did not deny the claim.

80.     Navarro and Espire made these representations with knowledge of their falsity.

16

81.     Navarro and Espire made these representations for the purpose of inducing Forkosh and Blu Market to enter into the Framework Agreement, and with the ultimate goal of inducing Forkosh and Blu Market to enter into a 50/50 partnership agreement.

82.     Forkosh and Blu Market did, in fact, rely on those material misrepresentations by executing the Framework Agreement.

83.     The Framework Agreement also contemplated material requirements prior to entering into a final partnership agreement that subsequently went unfulfilled.  For example, it required the creation of an operating agreement for the partnership (§ 18), the payment of salaries to Forkosh and Navarro (§ 6), and that "any business opportunities or income shall be directed by both Forkosh and Navarro" (§ 5).  However, no operating agreement was created, no salaries were paid, and no business opportunities or income were directed by the parties.  Furthermore, no formal entity was created and no related tax returns were filed.

84.     Moreover, the Framework Agreement left open additional terms for further negotiation that were never resolved.  In particular, the parties never resolved which company they would agree to operate to serve as the business (§ 5).

85.     On October 31, 2020, Forkosh's counsel confirmed, in an email to Navarro and her counsel, that Forkosh and Navarro spoke and agreed to rescind the framework agreement.  Neither Navarro, nor her counsel, denied the statement.  Instead, Navarro's counsel merely noted that he was unaware that the deal had even been executed in August.

## VIII. FORKOSH FOUNDS TAPP AND RE-ENTERS THE INFLUENCER MARKETING INDUSTRY

86.     In or around September 2020, seeking to re-enter the influencer advertising market, Forkosh founded TAPP.

17

87. Like Blu Market, TAPP is an intermediary between advertisers and influencers, and is a market-leader in the industry. TAPP, under Forkosh's supervision, has undergone rapid growth, and now maintains a network of more than 6,000 influencer affiliates. In addition to influencer marketing, TAPP engages in scaled paid media through which its team has built paid media strategies on Tik Tok, Snapchat, and Facebook for startups and Fortune 500 companies alike. TAPP's clients include industry leaders like Tik Tok, and growing startups like the Calm, which operates the top app for meditation and sleep.

## IX.  ESPIRE AND NAVARRO FILE THE ESPIRE ACTION AS PART OF DEFAMATORY CAMPAIGN

88. On December 13, 2021, as part of an ongoing campaign to defame Plaintiffs (and others), Espire and Navarro filed an action captioned, *Espire Ads, LLC et al. v. TAPP Influencers Corp. et al.*, No. 1:21-cv-10623 (S.D.N.Y.).

89. Following the filing, Espire and Navarro intentionally delayed subsequent filings necessary for the action to move forward, including delaying the filing of the civil cover sheet by two weeks.

90. Espire and Navarro used that initial period—when Plaintiffs could not defend themselves from the claims in the action—as an opportunity to defame Plaintiffs based solely on the allegations in the filing.

91. To that end, Navarro and Co, individually and through their companies (Espire, KVRMA, and Tapmob), sent texts and made statements about the litigation on social media to advertisers and influencers with whom Plaintiffs had business relations and to the influencer community generally.

92. For example, one text exchange said: "watch tappco go out of business in 2-3 months. I promise you that[.] There was a major lawsuit against them. Just fyi. When that

happens, you know where to go" and "I would stop trusting Tappco. They are about to face 25+ federal charges."

93.     Navarro also made public announcements both individually and in her representative capacity for Espire and KVRMA through Instagram Live. For example, on January 21, 2022, during an Instagram Live attended by over 2,500 individuals in the influencer community, Navarro invited her listeners to google her lawsuit, admitted that she diverted all of Blu Market's funds and then "bounced," asserted that Forkosh, Blu Market, and TAPP were scam artists, and admitted that the intellectual property which she claims in the Espire Action had been copied or stolen by TAPP from Espire actually originated with Blu Market.

94.     Navarro also asserted during the Instagram live that KVRMA had purchased Blu Market's intellectual property for $50,000, and that it was subsequently stolen back by Plaintiffs. This assertion is a transparently false claim invented to create a narrative to justify how the intellectual property at issue in the Espire Action could belong to Navarro and her entities. Her claim lacks any basis in fact, as evidenced by, among other things, the fact that KVRMA was not created until 2019.

95.     In that same Instagram Live, Navarro also said regarding TAPP and Forkosh that "my app, all of my IP, was stolen." In that same video she falsely claimed that Forkosh told her "not to pay out influencers." Navarro also falsely alleged that TAPP "hacked into my backend" and impermissibly used her videos to make "money off of my image." In that same video she admitted that she tried to spread these claims as widely as possible, stating "I tried to warn as many people as possible." She then referred to Forkosh and TAPP as "thieves."

96.     In a text, Navarro said the following about Forkosh and this litigation: "it's getting dismissed that was to not look guilty in community so he can keep Stealing from me[,]" "Scammed

@scary couple racks he still Owed scammed adlandi Ace 10k he still owed scammed @goof 8k he still owed[,]" "and pops should be enough[,]" "Yet u still tryna invite a known scammer[,]" and "Scammed woahlifehacks 20k who remembers that one."

97.    In another text, Navarro said the following about Forkosh and TAPP: "Cause this company dirty they scammed Peter @goof who referred u 8k u can text him and ask and scammed me For my app code and scammed tons of influencers in the past so I wouldn't even talk to those thieves if u was u especially since u started here anyway and there isn't anything they can give u I can't bc they only been around a year and I been working with the advertiser for 5+ years, I'm actually in a lawsuit with them so that's probably why they even hit u up[,]" and "I'm the first place they saw u promoting me and they just copy my every move[.]"

98.    Defendants' texts, video statements, and other pronouncements were false, defamatory, malicious, and libelous.

99.    Defendants were motivated by actual malice in that they knew that the allegations concerning plaintiffs were false and untrue.

100.    Defendants' intentional acts were committed for the sole, malicious purpose of inflicting economic damages against Plaintiffs.

101.    As a result of the publications and the acts of Defendants in connection therewith, Plaintiffs have been held up to public contempt, ridicule, disgrace, and prejudice, have been irreparably injured in their names, reputations, social standing, and have lost the esteem and respect of their friends, acquaintances, business associates, and the public generally.  Plaintiffs have also lost present and future business as a result of the defamatory statements.

102.    As a result of his role in the defamatory campaign, Co has directly violated the Settlement Agreement by disseminating defamatory texts to influencers and advertisers with which Blu Market has had a relationship, and otherwise soliciting those influencers and advertisers.

## X.    NAVARRO IS THE ALTER EGO OF ESPIRE AND KVRMA

103.    Navarro has complete control and domination over Espire and KVRMA.  As such, Navarro has a unity of interest and ownership with Espire and KVMRA such that no separation actually exists.

104.    During the course of her operation of Espire and KVRMA, Navarro has commingled funds with the corporate entities, thereby treating each entity as her own personal piggy bank, using corporate funds for vacations, apartments, automobiles, and other personal expenses.

105.    Navarro has blurred the lines between the two entities, claiming in her lawsuit that intellectual property was owned by Espire and in her defamatory broadcast that it had been purchased by KVRMA.  In this way and through other conduct Navarro has disregarded the corporate formalities of Espire and KVRMA.

106.    Navarro's complete disregard of the corporate entities has allowed her to shift assets and potentially alter claims to suit her own purposes and to shield herself from liability for what was a theft, not an acquisition.

107.    As such, an inequitable result will occur if the acts in question are treated as those of Espire and KVRMA alone, and not of Navarro.

108.    Upon information and belief, Espire and KVRMA are not adequately capitalized.

109.    By reason of Navarro's control of Espire and KVRMA, and her disregard of the legal structure of each, each entity should be considered to be a sham, Navarro should be personally liable for any damages assessed against them as their alter ego.

## CAUSES OF ACTION

### COUNT I
**(Tortious Interference With Contractual Relations
By Plaintiffs Against Defendants)**

110.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 109 as if fully set forth herein.

111.    Plaintiffs have entered into valid and enforceable contracts with their advertisers and influencers, including, but not limited to, (i) Jonathan Wilson—one of Plaintiffs' top influencers, (ii) Audie Wilson, head of Good Sound Management, an influencer management company that works with Plaintiffs, and (iii) numerous influencers within the Good Sound Management network.

112.    Defendants were aware of the contracts between Plaintiffs and their advertisers and influencers, including, but not limited to, Jonathan Wilson, Audie Wilson, and influencers within the Good Sound Management network.

113.    Defendants, acting with knowledge of the existence and terms of those contracts, intentionally and wrongfully procured the breach of those contracts by Plaintiffs' contractual counterparties.

114.    As a direct and proximate result of Defendants' tortious conduct, Plaintiffs have been damaged in an amount to be proven at trial of not less than $50 million, together with interest thereon, attorneys' fees, and costs.  These damages include, among other categories, the loss of present and future business with Plaintiffs' contractual counterparties, loss of credit, and loss of reputation.

## COUNT II
### (Tortious Interference With Prospective Business Relations
### By Plaintiffs Against Defendants)

115.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 114 as if fully set forth herein.

116.    Plaintiffs had prospective business relationships with advertisers and influencers, who would have been customers of Plaintiffs' services.

117.    Defendants had knowledge of those prospective business relations.  Acting with that knowledge, Defendants undertook intentional acts to interfere with those prospective business relations.   These  intentional  acts  included  contacting  the  advertisers  and  influencers  and communicating false and misleading information about Plaintiffs in an attempt to dissuade the advertisers and influencers from using Plaintiffs' services.

118.    Defendants' conduct was committed for the sole, malicious purpose of harming Plaintiffs by interfering with Plaintiffs' relationships with customers in the social influencing community.  Defendants' conduct was also undertaken with dishonest, unfair, or improper means, including through the dissemination of false information about Plaintiffs.

119.    Upon information and belief, due to Defendants' intentional acts, the advertisers and influencers chose not to use Plaintiffs' services.

120.    As a direct and proximate result of Defendants' tortious conduct, Plaintiffs have been damaged in an amount to be proven at trial of not less than $50 million, together with interest thereon, attorneys' fees, and costs.  These damages include, among other categories, the loss of present and future business, loss of credit, and loss of reputation.

## COUNT III
### (Breach of the Settlement Agreement by Forkosh and Blu Market Against Co)

121.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 120 as if fully set forth herein.

122.    The Settlement Agreement, dated May 28, 2015, constitutes a valid and binding contract between Forkosh and Blu Market, on the one hand, and Co, on the other hand.

123.    Co breached the Settlement Agreement by the conduct alleged herein, including, among other things: (i) violating Section 4's prohibition against "hir[ing], contact[ing], or enter[ing] into a business relationship with any BLU Market affiliate, its officers, directors, employees, or subsidiaries" and (ii) violating Section 6's prohibition against "contact[ing] any individual who was an advertiser or affiliate of the BLU Market Network during the term of the 2014 Agreement."  Specifically, among other conduct, Co impermissibly forwarded texts to advertisers and influencers with which Blu had a relationship and solicited those influencers and advertisers.

124.    Forkosh and Blu Market have performed all material obligations under the Settlement Agreement.

125.    As a direct and proximate result of Co's breach of contract, Forkosh and Blu Market have been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs.

## COUNT IV
### (Defamation By Plaintiffs Against Defendants)

126.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 125 as if fully set forth herein.

127.    Defendants have tortiously engaged in a campaign to defame Plaintiffs through false statements to advertisers and influencers.  Among other defamatory statements, Defendants

have asserted that Plaintiffs are scam artists that stole intellectual property. Those statements are untrue, false, and defamatory.

128. These statements were published without privilege or authorization to third-parties. As detailed herein, these statements were made through, among other things, Plaintiffs' complaint in the Espire Action, text messages to influencers and advertisers, and other pronouncements on social media, including Instagram Live. For example, during a January 21, 2022 Instagram Live broadcast, Navarro, acting on behalf of herself and Espire, stated that Plaintiffs were scam artists.

129. Defendants did not have a privilege to publish these false statements. Among other things, the statements made in Defendants' complaint in the Espire Action is not privileged because the true purpose of the filing was to wrongfully publish those false accusations to the social influencing community, not to prosecute the claims.

130. Defendants are at fault for their false and defamatory statements because, among other things, they were aware of the falsity of the statements. Indeed, Defendants continued to make the false and defamatory statements despite the receipt of a cease-and-desist letter specifically identifying the falsity and demanding that they cease making such statements.

131. The false and defamatory statements constitute defamation per se because they tend to injure Plaintiffs in their business.

132. Defendants' defamatory campaign was motivated by actual malice. Defendants' malice is apparent given their actual knowledge that the statements were false and untrue at the time that they were made.

133. As a direct and proximate result of Defendants' tortious conduct, Plaintiffs have been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees,

and costs. These damages include, among other categories, the loss of present and future business, loss of credit, and loss of reputation.

134.     Additionally, as a result of Defendants' willful, wanton, and malicious conduct, Plaintiffs are entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## COUNT V
### (Breach of the Non-Disclosure Agreement by Blu Market against Navarro)

135.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 134 as if fully set forth herein.

136.     As a term and condition of her employment with Blu Market, Navarro entered into the Non-Disclosure Agreement. Upon information and belief, Forkosh, on behalf of Blu Market, and Navarro, in her individual capacity, executed the Non-Disclosure Agreement upon the commencement of her employment at Blu Market in 2013 or 2014. The Non-Disclosure Agreement constitutes a valid and binding contract between Blu Market and Navarro.

137.     Blu Market performed all of its material obligations under the Non-Disclosure Agreement.

138.     Navarro breached the Non-Disclosure Agreement by, among other things, failing to maintain the confidentiality of confidential information provided to her by Blu Market in the course of her employment for Blu Market and by engaging in the unauthorized use of that information for her personal purposes, including her operation of Espire.

139.     As a direct and proximate result of Navarro's breach of contract, Blu Market has been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs.

## COUNT VI
### (Breach of the Employment Agreement by Blu Market against Navarro)

140.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 139 as if fully set forth herein.

141.     As a term and condition of her employment with Blu Market, Navarro entered into the Employment Agreement.  Upon information and belief, Forkosh, on behalf of Blu Market, and Navarro, in her individual capacity, executed the Employment Agreement upon the commencement of her employment at Blu Market in 2013 or 2014.  The Employment Agreement constitutes a valid and binding contract between Blu Market and Navarro.

142.     Blu Market performed all of its material obligations under the Employment Agreement.

143.     As set forth herein, Navarro breached the Employment Agreement by, among other things, (i) working on non-Blu Market projects while on Blu Market time, (ii) engaging in time theft through her work on non-Blu Market projects, (iii) failing to provide two weeks' notice of her resignation to Blu Market, and (iv) by stealing company property upon the termination of her employment.

144.     As a direct and proximate result of Navarro's breach of contract, Blu Market has been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs.

## COUNT VII
### (Declaratory Judgment by Forkosh and Blu Market Against Navarro and Espire)

145.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 144 as if fully set forth herein.

146.     There is an actual and substantial controversy between Forkosh and Blu Market, on the one hand, and Navarro and Espire, on the other hand, concerning the enforceability of the

Framework Agreement. Specifically, Forkosh and Blu Market contend that the Framework Agreement is a mere agreement to agree and is unenforceable because it is indefinite and uncertain. In the alternative, Forkosh and Blu Market contend the Framework Agreement is *void ab initio* and unenforceable due to, among other things, Navarro's fraudulent inducement of the contract, Navarro's failure of consideration, Navarro's inability to perform the contract, and Navarro's breach of the contract that substantially defeats the purpose of it. Navarro and Espire, however, contend that the Framework Agreement is enforceable. Navarro and Espire have evidenced that belief through their pleading of a claim for breach of the Framework Agreement against Forkosh in the Espire Action and their arguments on motion practice in the Espire Action that the contract is enforceable.

147. Forkosh and Blu Market, on the one hand, and Navarro and Espire, on the other hand, have adverse legal interests in that substantial controversy. The adverse nature of the relationship is demonstrated by the pleading of a claim for breach of the Framework Agreement by Navarro and Espire, which seeks the award of compensatory and other damages.

148. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment due to the ongoing litigation of Navarro and Espire's claim for breach of the Framework Agreement in the Espire Action.

149. The issuance of a declaratory judgment that the Framework Agreement is an agreement to agree, *void ab initio*, and otherwise unenforceable will serve a useful purpose in clarifying and settling the legal relations at issue between the parties, and it would also terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the dispute.

150.     Accordingly, Forkosh and Blu Market are entitled to an order that the Framework Agreement is an agreement to agree, *void ab initio*, and otherwise unenforceable for the reasons detailed herein.

**COUNT VIII**
**(In the alternative, Fraudulent Inducement**
**by Forkosh and Blu Market Against Navarro and Espire)**

151.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 150 as if fully set forth herein.

152.     To the extent that the Court finds that the Framework Agreement does not fail as an agreement to agree, Forkosh and Blu Market plead this alternative claim for fraudulent inducement against Navarro and Espire.

153.     Navarro and Espire fraudulently induced Forkosh and Blu Market to enter into the Framework Agreement.

154.     As set forth herein, prior to the execution of the Framework Agreement, and in its terms, Navarro and Espire made false representations of material fact to Forkosh and Blu Market. Among other representations, Navarro and Espire informed Forkosh and Blu Market that: (i) "Navarro is the sole owner and CEO of Espire" (Framework Agreement, § 2); (ii) that Navarro was able to provide Forkosh with a 50% ownership interest in Espire (*id.* § 4); (iii) that Navarro "has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions for the due authorization, execution, delivery and performance of this Agreement by it have been duly taken" (*id.* § 8(a)); and (iv) that Navarro's "authorization, execution, delivery and performance of this Agreement by it does not conflict with any other agreement or arrangement to which it is a party or by which it is bound" (*id.* § 8(c)).

155.     At the time that Navarro and Espire made these false representations of material fact, they knew that they were untrue.

156.    Navarro and Espire made these false representations of material fact with the intention that Forkosh and Blu Market rely upon them.  In particular, Navarro and Espire wanted Forkosh and Blu Market to rely on them so that they would enter into the Framework Agreement and ultimately a forthcoming partnership agreement.

157.    Forkosh and Blu Market did, in fact, justifiably rely on these false representations of material fact.  Forkosh and Blu Market did so in executing the Framework Agreement on August 29, 2020.

158.    Forkosh has suffered damages resulting from Navarro's fraudulent inducement in that the Framework Agreement provides Navarro with a 50% ownership interest in Blu Market without consideration and that he has not received any proceeds from the operation of Espire to which he would otherwise be entitled.

159.    As a direct and proximate result of Navarro and Espire's fraudulent inducement, Forkosh and Blu Market have been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs.  Forkosh and Blu Market are also entitled to rescissory damages as a result of being fraudulently induced into entering into the Framework Agreement.

160.    In addition, because Navarro and Espire's actions were taken with a high degree of moral turpitude that demonstrates wanton dishonesty and complete indifference to civil obligations, Forkosh and Blu Market are entitled to recover punitive damages from Navarro in an amount to be determined at trial.

## <u>COUNT IX</u>
### **(In the alternative, Rescission by Forkosh and Blu Market Against Navarro and Espire)**

161.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 160 as if fully set forth herein.

162.     To the extent that the Court finds that the Framework Agreement does not fail for as an agreement to agree, Forkosh and Blu Market plead this alternative claim for rescission.

163.     On August 29, 2020, Forkosh and Blu Market executed the Framework Agreement as counterparties to Navarro and Espire.

164.     Forkosh and Blu Market are entitled to rescission of the Framework Agreement due to (i) Navarro and Espire's fraudulent inducement of Forkosh and Blu Market into executing the agreement, (ii) failure of consideration, (iii) Navarro's inability to perform the contract after it is made, and (iv) a breach of the contract by Navarro that substantially defeats the purpose thereof.

165.     As detailed herein, the Framework Agreement is subject to rescission because Navarro and Espire fraudulently induced Forkosh and Blu Market to enter into the Framework Agreement by making material misrepresentations to them.  Those representations included that Navarro owned a 100% interest in Espire and that she was capable of transferring a 50% interest in Espire to Forkosh.  At the time that they made those misrepresentations, Navarro and Espire knew that they were false.  Navarro and Espire made those material misrepresentations for the purpose of inducing reliance by Forkosh and Blu Market.  Forkosh and Blu Market did, in fact, rely on those material misrepresentations by executing the Framework Agreement.

166.     The Framework Agreement is also subject to due to the failure of consideration.  Specifically, as consideration for the Framework Agreement, Navarro was required to transfer a 50% ownership interest in Espire to Forkosh.  Navarro, however, failed to transfer any ownership interest in Espire to Forkosh.

167.     The Framework Agreement is also subject to rescission due to Navarro's inability to perform the contract after it is made.  Specifically, the Framework Agreement required Navarro to transfer a 50% ownership interest in Espire to Forkosh.  Upon information and belief, Navarro

did not, in fact, own a 50% ownership interest in Espire at the time of contracting. Accordingly, Navarro was unable to perform her obligations under the Framework Agreement.

168.    The Framework Agreement is also subject to rescission due to a breach in the contract by Navarro that substantially defeats the purpose thereof. Specifically, Navarro breached the Framework Agreement by failing to transfer a 50% ownership interest in Espire to Forkosh. The purpose of the Framework Agreement was to create a partnership through which Forkosh and Navarro were each 50% owners in Espire and Blu Market. Navarro's failure to transfer the requisite ownership interest in Espire substantially defeats the purpose of the agreement, warranting rescission of the contract.

169.    Forkosh has suffered damages resulting from Navarro's misrepresentations in that the Framework Agreement provides Navarro with a 50% ownership interest in Blu Market without consideration and that he has not received any proceeds from the operation of Espire to which he would otherwise be entitled.

170.    As a direct and proximate result of Navarro and Espire's misrepresentation, Forkosh and Blu Market have been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs. Forkosh and Blu Market are also entitled to rescissory damages as a result of being fraudulently induced into entering into the Framework Agreement.

171.    Accordingly, Forkosh and Blu Market are entitled to an order of rescission concerning the Framework Agreement.

## COUNT X
### (In the alternative, Breach of the Framework Agreement by Forkosh and Blu Market Against Navarro)

172.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 171 as if fully set forth herein.

173.    To the extent that the Court finds that the Framework Agreement is valid and enforceable, Forkosh and Blu Market plead this alternative claim for breach of contract against Navarro.

174.    On August 29, 2020, Forkosh and Blu Market, on the other hand, and Navarro and Espire, on the other hand, entered into the Framework Agreement.

175.    Pursuant to the terms of the Framework Agreement, Navarro was (i) required to transfer a 50% ownership interest in Espire to Forkosh (§4); (ii) prohibited from "directly or indirectly solicit[ing] business from any customers" of the combined entity (§11(a)); and (iii) prohibited from "directly or indirectly hav[ing] any ownership interest in, manage, operate, join or control, or participate in the ownership, management, operation, or control of any business, entity, firm or corporation, which engages in businesses similar to those engaged in by the Company or that competes with the business of the Company . . . including social media marketing, sales and other influencer-related forms of monetization" (§11(b)).

176.    Navarro has breached the Framework Agreement by, among other things, (i) failing to transfer a 50% ownership interest in Espire to Forkosh, (ii) engaging in the solicitation of Blu Market's customers, and (iii) owning and operating competing entities, including KVRMA.

177.    Forkosh has performed all material obligations that he has under the Framework Agreement.

178.    Forkosh has suffered damages resulting from Navarro's breaches of contract in that he awarded Navarro a 50% ownership interest in Blu Market without consideration and that he has not received any proceeds from the operation of Espire to which he would otherwise be entitled.

179.     As a direct and proximate result of Navarro breach of contract, Forkosh has been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs.

<u>**COUNT XI**</u>
**(In the alternative, Breach of Fiduciary Duty by Forkosh Against Navarro)**

180.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 179 as if fully set forth herein.

181.     To the extent that the Court finds that the Framework Agreement is valid and enforceable, Forkosh pleads this alternative claim for breach of fiduciary against Navarro.

182.     On August 29, 2020, Forkosh and Blu Market, on the other hand, and Navarro and Espire, on the other hand, entered into the Framework Agreement.

183.     Pursuant to the terms, Forkosh and Espire were to enter into a "50%/50%" partnership through which each individual would be equal partners in Blu Market and Espire. Through that partnership, Navarro was obligated to "oversee[] the influencer relations and operations of the overall company" while Forkosh was obligated to "oversee[] the Tech, Business Development and Legal departments of the company."

184.     As a result of Navarro's partnership with Forkosh, Navarro owed fiduciary duties to Forkosh, including but not limited to a duty of loyalty.

185.     As detailed herein, Navarro knowingly breached that duty by, among other things, engaging in a campaign to defame Forkosh and Blu Market, seeking to interfere with Forkosh and Blu Market's business relationships, filing a frivolous litigation against Plaintiffs, and steering all of her business opportunities to Espire, at the direct expense of her purported partner.

186. As a direct and proximate result of Navarro breach of fiduciary duty, Forkosh has been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs are entitled to a judgment against Defendants awarding Plaintiffs the following relief:

A. Compensatory damages in an amount to be determined at trial, but not less than $50,000,000;

B. A declaration that the Framework Agreement is void and unenforceable;

C. Rescission of the Framework Agreement;

D. An injunction preliminary and permanently enjoining Defendants and its agents, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in concert with it, from:

    i. Inducing or permitting any current or former TAPP employee or influencers to disclose any of TAPP's trade secrets;

    ii. Accessing, using, imitating, copying, disclosing, or making available to any person or entity any of TAPP's trade secrets;

    iii. Interfering with the Employment and Non-Disclosure Agreements between TAPP and any of its current or former employees or influencers; or

    iv. Deleting or otherwise destroying, concealing, or altering any of TAPP's trade secrets;

E.     Compel Defendants to take affirmative actions to protect TAPP's trade secrets, including: the seizure and return of all documents or information in Defendants' possession that concern or relate to TAPP's trade secrets;

F.     Punitive damages in an amount to be determined at trial;

G.     Prejudgment and post-judgment interest;

H.     Costs and attorneys' fees incurred in connection with this action; and

I.     Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury as to all matters so triable.

Dated: April 28, 2023

**KASOWITZ BENSON TORRES LLP**     **RICHARD L. HERZFELD, P.C.**

By: */s/ Sarmad M. Khojasteh*
Sarmad M. Khojasteh                     Richard L. Herzfeld
Stephen P. Thomasch                     112 Madison Avenue
Yarden N. Hodes                         8th Floor
1633 Broadway                           New York, New York 10016
New York, New York 10019                Telephone: (212) 818-9019
Telephone: (212) 506-1700               rherzfeld@herzfeldlaw.com
skhojasteh@kasowitz.com
sthomasch@kasowitz.com
yhodes@kasowitz.com

*Attorneys for Plaintiffs*